|! MURRAY, Judge.
Defendants, Lafarge Corporation, La-farge Concrete, Lafarge Construction Materials, Clinton Evans, and Travelers Insurance Company (hereinafter referred to as Lafarge) appeal a judgment in favor of plaintiff, Kenneth Russell. Lafarge claims that the trial court erred in finding it liable, for giving any weight to Mr. Russell’s testimony, and in awarding him damages after finding him to be less than credible. For the following reasons, we affirm.
FACTS:
Mr. Russell was working as a plumber mechanic for Aardvark Plumbing at a job site in Eastern New Orleans on January 19, 1995. He and a helper were attempting to install a pipe in a six by ten foot hole. The ground in the area was soft and muddy, and the hole kept filling up with water, causing the pipe to fall over. Mr. Russell requested of the job foreman that a cement truck pour concrete into a form he had built in the hole to support the pipe. According to Mr. Russell, when the cement truck arrived on the job site, he spoke with the driver about where to pour the cement, then got in the hole to wait for the cement to be poured. He ^testified that he did not give any signals at all to the driver. As the truck backed up toward the hole, Mr. Russell saw the chute extension begin to swing toward him, and he leaned away from the chute, placing his left hand on the pipe to balance himself. As the chute swung towards him, he reached out with his right hand in an attempt to prevent the chute from hitting him, but could not stop it from smashing his left hand against the pipe. Mr. Russell hollered for the truck driver to pull back, and several minutes later his hand was released from between the chute and the pipe.
Mr. Russell’s helper, Teddy Vido, testified that he did not give any hand signals to the truck driver, nor did he see Mr. Russell give any. He did not see anything leading up to the accident, but realized that Mr. Russell was hurt when he heard him screaming at the truck driver to pull back.
Richard Ellis, an employee of an engineering consulting firm working at the job site, testified that he was coming out of a construction trailer when he saw Mr. Russell standing behind a concrete truck guiding it as it backed up. Mr. Russell had one hand on the chute attached to the truck, and was motioning to the truck driver with the other hand. When the truck got into a position where Mr. Russell could no longer see the driver, the man apparently helping Mr. Russell on the job began to signal the truck driver. When Mr. Elks saw that Mr. Russell’s hand was being crushed between the chute and the pipe, he and two other men with whom he was walking, signaled the truck driver to pull away.
|aThe job superintendent transported Mr. Russell to a nearby emergency room where his hand was cleaned and bandaged, and he was given pain medication. X-rays taken at that time were negative for any broken bones. Mr. Russell was released from the emergency room with instructions to see an orthopedic doctor in a week to remove the bandages.
Over the next two years, at least ten physicians, occupational therapists and physical therapists treated Mr. Russell. Drs. Robert Schiavi, Harold Stokes, and Mark Kappelman all diagnosed Mr. Russell with reflex sympathetic dystrophy (RSD), a condition that indicates an abnormal response of the autonomic nervous system.[1] Mr. Russell underwent surgery *757 to relieve his symptoms, and although initially he reported some improvement, he continued to complain of severe, debilitating pain in his hand.
All of the doctors who treated him after the surgery, except for Dr. Robert Davis, a psychiatrist, and Dr. Rand Metoyer, an anesthesiologist with a subspecialty in pain management, testified that they believed Mr. Russell was magnifying his symptoms. None of the doctors, except the two noted, could find any clinical reason for the continued pain and inability to use his hand. The trial court stated in reasons for judgment that “[n]o fewer than seven physicians and/or occupational therapists have opined that the plaintiff was malingering, demonstrated ‘symptom magnification’ or had symptoms that were inconsistent Rwith any known neurological pattern.” However, the trial court also found, as a matter of fact, that Mr. Russell proved that he had a crushing-type injury to his hand for which he underwent a surgical procedure. The trial court further found Lafarge hable for Mr. Russell’s injury because the Lafarge truck driver violated his own company’s policy by taking hand signals from two different people. The court also found, however, that Mr. Russell was partially responsible for his injury in misguiding the chute and placing his hand in a position where it could be crushed. The court awarded Mr. Russell $60,000 in general damages, $30,000 in medical expenses, and $6,094.82 in lost wages, reduced by thirty percent for his comparative fault.
DISCUSSION:
Lafarge argues that it was error for the trial court to find it negligent because its driver violated Lafarge safety rules by allowing two different people to direct him in backing up the cement truck. Lafarge contends that the purpose of the safety rule is to prevent the truck driver from receiving conflicting directions, and that the testimony does not support the fact that conflicting directions were given. We disagree.
Mr. Russell denied having given any hand signals to the driver; Mr. Russell’s helper, Teddy Vido testified that he did not give any signals to the driver, nor did he see Mr. Russell give any. Clinton Evans, Lafarge’s driver, testified that he was taking signals from both Mr. Russell and his helper. Richard Ellis, an independent eyewitness, testified that he saw Mr. Russell giving hand signals until Isthe driver could no longer see him ánd then the man apparently helping Mr. Russell began signaling.
It is inconceivable that the truck driver, who had sixteen years experience, was backing his cement truck toward a hole in which men were standing, without taking directions from someone. The trial court believed the driver, who testified that he was taking directions from both Mr. Russell and Mr. Vido, in violation of Lafarge’s safety policies. Although no one specifically stated that the hand signals from these two men conflicted, Mr. Russell’s hand became trapped between the cement chute and the pipe. It, therefore, was not unreasonable for the court to infer that either Mr. Russell or Mr. Vido gave incorrect or conflicting signals. In addition, as the trial court noted, because the chutes were allowed to swing freely, it was necessary for someone to stabilize and guide them for the pour. Based on this evidence, and considering the conflicting testimony as to how the cement truck was directed to back up, the trial court determined that both Lafarge and Mr. Russell were responsible for his injury. We find no error in that determination.
The remainder of Lafarge’s assignments of error relate to Mr. Russell’s lack of credibility. Because the trial court made the specific finding that Mr. Russell was malingering and magnifying his *758 claims, Lafarge contends that it was error to award damages to him.
The trial court found that, despite having been proven to have exaggerated his symptoms and voluntarily restricted the use of his hand, Mr. Russell had proven that he had a crushing injury to his left hand, was diagnosed with RSD, and | Bunderwent surgery to correct the condition. The record supports this finding. Therefore, the only issue for this Court to review is whether the trial court’s award for that injury and its sequela is excessive.
Much discretion is accorded the trier-of-fact in fixing damage awards. Because of this vast discretion, an appellate court should rarely disturb an award of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); also see Riley v. Reliance Ins. Co., 97-0445, p. 7 (La.App. 4 Cir. 11/19/97), 703 So.2d 158, 163 (An award should only be disturbed if it is either so low or so high in proportion to the injury that it “shocks the conscience.”).
The trial court awarded Mr. Russell $60,000 in general damages, $30,000 in medical .expenses and $6,094.82, reduced by his percentage of fault. The court heard testimony from Mr. Russell, his helper, the truck driver, and an independent eyewitness concerning the events surrounding the accident. All four men testified that Mr. Russell’s hand was crushed between the chute of the cement truck and the pipe being installed in the hole.
Lafarge argues that, because he was diagnosed with RSD based on his subjective complaints of pain, Mr. Russell’s lack of credibility precludes any award of damages that relate to that condition. However, the court carefully considered the diagnosis of RSD, and concluded that Mr. Russell had proven that it was more probable than not that he, in fact, suffered from RSD. As discussed below, the evidence supports this conclusion.
|7Pr. Schiavi, an orthopedic surgeon and the first doctor with whom Mr. Russell consulted, testified that he reviewed the hospital emergency room records and noted that Mr. Russell had marked swelling and an abrasion to the back of his hand. His examination five days post-accident, revealed that he still had marked swelling of the hand, including the fingers, an abrasion to the back of the hand, and limited movement with pain. He diagnosed Mr. Russell with RSD after a physical examination revealed no objective findings of injury. None of the bones in his hand were fractured, and there was no evidence that any nerves were cut or damaged, yet Mr. Russell’s hand was cold, a condition he could not create on his own. To verify the diagnosis, Dr. Schiavi had Mr. Russell undergo a nerve block to see if the autonomic nervous system was causing the problems in his hand.
Two nerve blocks were performed which seemed to provide temporary relief from pain. However, despite the nerve blocks, physical therapy and a negative EMG, Mr. Russell continued to complain of pain in his hand. Dr. Schiavi referred Mr. Russell to Dr. Harold Stokes for a second opinion.
Dr. Stokes testified that there were no clinical findings of nerve compression in Mr. Russell’s arm or hand. He did not recommend surgical intervention, but concluded that Mr. Russell may require a sympathectomy to relieve his symptoms of RSD.
Dr. Mark Kappelman, a thoracic surgeon, testified by deposition that upon his initial examination, he found that Mr. Russell’s hand was sweaty and cool, and that Mr. Russell was very protective of his hand, classic symptoms of RSD. He |sdid not note any atrophy of the hand, but there was some swelling in the thumb area. Because Mr. Russell had good results with previous nerve blocks, Dr. Kap-pelman determined that Mr. Russell would benefit from a sympathectomy, a procedure in which the lower portion of the stellate ganglion and the sympathetic *759 nerves attached to it are removed to den-ervate the sympathetic supply to that extremity. The surgery, which was performed on April 25, 1995, was done under general anesthesia. Four small incisions were made in the neck area into which Dr. Kappelman inserted a scope to view the stellate ganglion. He then removed the lower third of the ganglion, which is the portion that controls constriction of blood vessels and temperature in the upper extremities. Dr. Kappelman examined Mr. Russell one month after the surgery and believed that the RSD was resolved. Mr. Russell’s hand was warm, was not sweating, and he reported a decrease in pain.
Drs. Schiavi, Stokes, and Kappelman each testified that, in his opinion, Mr. Russell would benefit from a sympathectomy. Mr. Russell had extensive medical bills following this surgery and did not return to work for some time. The court, however, awarded no damages beyond the surgery. This is the point at which the doctors’ testified Mr. Russell should have shown marked improvement. It is apparent that the court’s decision not to award damages beyond the surgery was based on Mr. Russell’s lack of credibility. The trial court appears to have very carefully and objectively weighed all the evidence in making its award, which is | (¡supported by the record. Because the court did not abuse its vast discretion in assessing Mr. Russell’s damages, we will not disturb the award.
AFFIRMED.
LANDRIEU, J., concurs with reasons.

. The autonomic nervous system is the portion of the nervous system that controls the involuntary functions of the body, for example, breathing and blood circulation. The *757 sympathetic nervous system is the thoracic and lumbar portions of the autonomic nervous system.