898 So.2d 497 (2005)
Rose Mary LeMASTERS
v.
BOYD GAMING CORPORATION and Treasure Chest Casino, L.L.C. d/b/a Treasure Chest Casino.
No. 04-CA-1054.
Court of Appeal of Louisiana, Fifth Circuit.
February 15, 2005.
*499 Robert P. Charbonnet, Jr., Charbonnet Law Firm, L.L.C., Metairie, LA, and James S. Rees, III, Covington, LA, for Plaintiff/Appellee-2nd Appellant.
Peter B. Sloss, James M. Jacobs, Murphy, Rogers & Sloss, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
The defendant, Treasure Chest Casino, L.L.C., suspensively appealed the trial court's judgment awarding plaintiff future medical expenses, while the plaintiff, Rose Mary LeMasters, devolutively appealed the trial court's award of general damages. For the reasons that follow, we affirm the award of future medical expenses and amend the judgment to increase the general damage award.

FACTS:
Mrs. LeMasters was injured on January 15, 2001 when the door of a slot machine opened and fell on her as she sat in a chair in front of the machine. Mrs. LeMasters testified that she was playing the machine when an employee of defendant requested that he be allowed to remove the money from the machine. Mrs. LeMasters complied with his request and she stepped away from the machine. When she sat down to resume playing the machine, the bottom portion of the door came down into her lap. Mrs. LeMasters testified that she attempted to raise the door with her hand and the door struck her right hip. She was then able to move herself off of the chair and away from the machine. She summoned an employee of the defendant who called for medical assistance. Mrs. LeMasters testified that she felt immediate pain in her right hand and hip. She was given ice by the emergency medical technicians who responded at the scene; she refused to be transported by ambulance to an emergency room. Later that evening, she went to see Dr. Donald Gordillo, who had treated her in the past. She explained that Dr. Gordillo referred her for treatment by an orthopedist, Dr. John Burvant.
Mrs. LeMasters testified that she visited Dr. Burvant and complained of pain in her right hip, right shoulder, and right hand. Dr. Burvant suggested she receive a cortisone injection in her shoulder. Mrs. LeMasters explained that she was reluctant to have an injection in her shoulder and did not have this injection until approximately four months later. Mrs. LeMasters testified that she attended physical therapy at the recommendation of Dr. Burvant. She stated that the physical therapy did not help her pain. Dr. Burvant then ordered nerve conduction studies, after which he recommended surgery. *500 Mrs. LeMasters testified that she did not want to undergo surgery so she sought treatment from Dr. L.S. Kewalramani. After several months of unsuccessful treatment, she was referred to Dr. Bradley Bartholomew. Dr. Bartholomew recommended she have a ganglion block in which a needle is inserted into the neck to block the nerve causing the pain. Mrs. LeMasters testified that she was reluctant to undergo this procedure, but did so several months later when other treatments did not relieve her pain. She testified that this procedure, which was performed just prior to trial, relieved her pain for approximately three weeks. At the time of trial Mrs. LeMasters had slight pain in her right hand and wrist. Mrs. LeMasters testified that if the pain comes back and the ganglion blocks do not relieve the pain, she will undergo surgery.
Mrs. LeMasters explained that she worked as a waitress in a coffee shop approximately 26 hours per week. She performed the same job duties both before and after the accident. She testified that the pain does not prevent her from performing most of her job duties, just "heavy work".
Dr. Burvant was accepted by the court as an expert in orthopedics. Dr. Burvant testified that he had treated plaintiff since 1995. He stated that he diagnosed her with carpal tunnel syndrome in 1995 and recommended surgery in 1997, but because of Mrs. LeMaster's reluctance to undergo surgery, she did not have the surgery until 2000. He explained that plaintiff had a good result from the carpal tunnel surgery. Dr. Burvant examined plaintiff on March 14, 2001 and she related the history of the slot machine door falling on her. Dr. Burvant's impression was rotator cuff tendonitis, a contusion of the hand, and inflammation of the muscles of the hip. He ordered an MRI for the shoulder.
Mrs. LeMasters returned to Dr. Burvant on March 27, 2001 complaining of right shoulder pain, tingling in her right hand, and soreness in the right hip. She was given a prescription of Vicodin. The MRI of the shoulder revealed tendonitis, but no evidence of a rotator cuff tear. When Mrs. LeMasters returned on April 6, 2001, she complained of pain in the right shoulder and hip. Dr. Burvant suggested cortisone injections, but Mrs. LeMasters was very reluctant to have the injections. She was given a prescription for Naprosyn.
Dr. Burvant testified that when Mrs. LeMasters returned on September 4, 2001, she complained of right hand pain and "quivering" of her hand and finger that had not resolved since the accident in January. Dr. Burvant testified that at this point he thought that Mrs. LeMasters had a condition known as reflex sympathetic dystrophy (hereinafter RSD). Dr. Burvant reached this impression because of the complaints of continued pain and pain when she attempted to grip her hand. He referred her for occupational therapy.
Dr. Burvant testified that when Mrs. LeMasters returned on October 23, 2001, she complained of pain and stiffness in the right hand. Dr. Burvant noted that she was holding the right hand in the left and swelling in the right hand. Dr. Burvant's impression was that Mrs. LeMasters had an "RSD type picture" in the right hand and bursitis in her shoulder. She was given an injection in the shoulder. He again recommended occupational therapy. When Mrs. LeMasters returned on February 19, 2002, Dr. Burvant noted that she continued to have decreased grip strength and tingling in the right hand. He referred her for nerve conduction studies in her hand. Dr. Burvant testified that he suspected RSD because her complaints of pain were out of proportion to her injury. *501 Dr. Burvant testified that Mrs. LeMasters returned on April 2, 2002, but the results of the studies were not available. At this visit, Mrs. LeMasters complained of pain in her neck following the studies and continued pain in the right hand. He prescribed Vicodin.
Dr. Burvant testified that when Mrs. LeMasters returned to his office on January 14, 2003, she was holding her right hand in her left hand and complained of pain from her right forearm to her right hand. She was hesitant to extend her fingers because of pain, but was able to do so. Dr. Burvant noted excessive sweating of the right hand as compared to the left. He attempted to give Mrs. LeMasters an injection in her wrist in an attempt to treat her pain, but when he performed the initial needle stick, she stated that she could not tolerate it. He then referred her for a stellate ganglion block for the RSD. Dr. Burvant testified that Mrs. LeMasters took several months to have the block performed and reported to him following the block that she had near complete resolution of her symptoms. Dr. Burvant explained that relief from the block is diagnostic of RSD. He stated that when the pain returns, Mrs. LeMasters will probably want to have another block. When the blocks stop working, she can have surgery to remove the stellate ganglion to alleviate the pain. He opined that the injury from the January 2001 accident caused the RSD.
Dr. Joseph Crapanzano, who was accepted by the court as an expert anesthesiologist with a subspecialty in pain management, testified that he examined Mrs. LeMasters on April 24, 2003. Dr. Crapanzano noted that her right hand was cooler than her left, there was increased perspiration in her right hand, and she had decreased grip strength in her right hand and decreased strength in her right upper extremity. Dr. Crapanzano found these symptoms consistent with RSD. He explained that he examines patients prior to performing the block in order to make an independent determination as to whether the block will be beneficial to the patient. He explained that the stellate ganglion block is diagnostic for RSD. Dr. Crapanzano testified that he administered the stellate ganglion block to Mrs. LeMasters on May 16, 2003 and she had complete relief of pain in her arm. Dr. Crapanzano further testified that the fact that she had pain relief on the drug Neurotin, which is used for nerve pain, also supports the diagnosis of RSD. Dr. Crapanzano stated that while the block can be curative of RSD, usually patients have a series of block then the block no longer relieves their pain. He explained that when the blocks are no longer successful, surgery is performed to remove the stellate ganglion.
Dr. Daniel Trahant was accepted by the court as an expert in neurology. He testified that he performed nerve conduction studies on Mrs. LeMasters on October 29, 2002. He explained that the studies showed a decrease in the impulse across the median nerve that was compatible with moderate carpal tunnel syndrome. He explained that these studies are not related to the diagnosis of RSD and that she could have the carpal tunnel syndrome and RSD. Dr. Trahant agreed that the fact that Mrs. LeMasters had pain relief with the block supports the diagnosis of RSD. Dr. Trahant further testified that the pain usually resumes after the block wears off and that when the block stops working the treatment for RSD is surgical.
Dr. Bradley Bartholomew was accepted by the court as an expert in neurosurgery. Dr. Bartholomew testified that Mrs. LeMasters was referred to him by Dr. Kewalramani in September 2002 for complaints of neck pain and weakness in her *502 hands. Dr. Bartholomew testified that Mrs. LeMasters was taking hydrocodone for pain, Xanax for anxiety, and an anti-inflammatory medication. She had previously been on Elavil to alleviate pain and help her sleep, Tegretol for neuropathic pain, and Norflex, a muscle relaxer. He explained that she was functioning and using her hand because of the medications. Dr. Bartholomew testified that plaintiff's examination was consistent with RSD in that she had decreased strength and sensory loss in her right hand. He explained that RSD is diagnosed by clinical picture and there was no test for RSD. Dr. Bartholomew explained that the fact that she had 50% relief of her pain while taking Neurotin supported the diagnosis of RSD. He further testified that the fact that she had 100% relief from the block is diagnostic for RSD. Dr. Bartholomew testified that the pain usually returns to the same level it was prior to the block. At this point, a surgical procedure called a sympathectomy to remove the stellate ganglion is performed to resolve the pain. Dr. Bartholomew explained that Mrs. LeMasters has two choices, to live with the pain or have surgery. He stated that most people have the surgery. While Dr. Bartholomew testified that he had not yet recommended surgery for Mrs. LeMasters, her prognosis includes probable surgery in the future. Dr. Bartholomew stated his fee for this surgery would range from $3,500.00 to $5,000.00 and he estimated the hospital charges for this surgery would range form $10,000.00 to $20,000.00.
The defendant submitted the deposition of Dr. John Steck into evidence. Dr. Steck is a neurosurgeon who examined plaintiff at the request of the defendant. Dr. Steck explained that RSD is a difficult diagnosis to confirm. He stated that it most commonly results from a crushing injury, but can occur after a trivial injury. Dr. Steck testified that the fact that plaintiff had pain relief from Neurotin and from the block support the diagnosis of RSD. Dr. Steck explained while he was not stating that plaintiff did not have RSD, the data to support the diagnosis of RSD was based on plaintiff's subjective complaints  pain and decreased grip strength.
Medical records and bills from Drs. Burvant, Bartholomew, Kewalramani, Crapanzano, and Trahant, along with records and bills from physical therapy services, East Jefferson General Hospital, and Kenner Regional Medical Center were introduced into evidence. These records were consistent with the testimony. Six videotapes were also introduced into evidence. One videotape depicted the Treasure Chest just after the accident showing plaintiff putting ice on her hand. Three tapes depicted plaintiff working at a coffee shop on three separate dates. Two tapes were designated as "highlights tapes". The defendant's highlights tape depicts plaintiff pouring coffee, carrying plates, picking up utensils and performing various other tasks of her job using her right hand. The plaintiff's highlights tape depicts plaintiff showing her right hand and arm to a customer, seemingly describing her pain and moving her fingers on her right hand.
At the conclusion of trial, the trial judge took the matter under advisement. He then issued a judgment in favor of plaintiff awarding the following damages:

 Past Medicals $12,521.08
 Future Medicals $20,000.00
 General Damages $ 5,000.00

The defendant filed a suspensive appeal regarding the award of future medical expenses and the plaintiff filed a devolutive appeal regarding the amount of general damages.

FUTURE MEDICAL EXPENSES:
On appeal, the defendant claims the evidence does not support the award of *503 future medical expenses. Defendant argues that future medical expenses must be established with some degree of certainty and cannot be awarded on mere speculation. Defendant contends that plaintiff testified that she would only have surgery if her pain became very severe and that in light of the videotapes depicting plaintiff with complaints "far less than severe" it is a "speculative leap" to conclude that her complaints would go from minimal to severe and would more probably than not need surgery. Plaintiff responds that the award of future medical expenses is supported by the testimony of Dr. Bartholomew.
Future medical expenses must be established with some degree of certainty. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670. An award for future medical expenses is speculative, and although insusceptible of determination with mathematical certainty, must be established, like any other element of damages, with some degree of certainty. Holt v. State Through Dept. of Transp. and Development, 28-183 (La.App.4/3/96), 671 So.2d 1164. Awards for future medical expenses that may or may not be incurred require medical testimony that they are indicated and their probable costs. Id.
We find that the award of future medical expenses to plaintiff is supported by the testimony of the physicians who testified. Dr. Burvant testified that plaintiff had RSD and that this condition is treated with blocks to the stellate ganglion and that the pain returns after the block. Dr. Burvant testified that if the blocks fail, the treatment is surgical. He further stated that the stellate ganglion can be painful until it is removed. Dr. Crapanzano testified that usually patients with RSD have a series of blocks and then they get no further benefit from the blocks. When this occurs surgery is performed to remove the stellate ganglion. Dr. Bartholomew testified that the block is not the final treatment for RSD. He explained that the blocks are used to aid in diagnosis and to give some relief, but the pain returns to the previous level. When that occurs surgery is indicated. Dr. Bartholomew explained that her pain will come back most likely to the level that it was prior to the block. At this point plaintiff will have to decide whether she can live with the pain or have surgery. He further stated that most patients have surgery. He testified that a sympathectomy to remove the stellate ganglion resolves the pain. Dr. Bartholomew further testified that his fee for this type of procedure ranges from $3,500.00 to $5,000.00 and the hospital charges for this surgery can range from $10,000.00 to $20,000.00. He further stated that her prognosis was for probable surgery in the future. Based on the testimony of all of these physicians, we find that plaintiff proved her need for medical treatment in the future and the cost of that treatment. Hence, we see no error in the trial court's award of future medical expenses.

GENERAL DAMAGES:
Plaintiff contends the trial court committed manifest error in awarding only $5,000.00 in general damages to a plaintiff who suffered with RSD for 2 1/2 years and whose condition is expected to deteriorate. Intertwined with this argument is plaintiff's contention that the trial court improperly admitted the surveillance videotapes, which unduly influenced the trial court in its award of general damages. The defendant contends the record supports the conclusion that plaintiff had no significant pain or suffering, and therefore, the $5,000.00 award should be affirmed.
*504 General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Duncan v. Kansas City Southern Railway Co., XXXX-XXXX (La.10/30/00), 773 So.2d 670. Much discretion is accorded the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1; Id. The trier of fact's vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is to review the exercise of discretion by the trier of fact not to decide what it considers to be an appropriate award. Id. As the Supreme Court explained in Youn, supra:
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.

Id. at 1261.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv. Inc., 99-0934 (La.10/29/99), 747 So.2d 1085. It is only after the appellate court has determined that the trier of fact abused its discretion is a resort to prior awards appropriate; the prior awards may be referred to only for the purpose of determining the highest or lowest point, which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
In the case before us, plaintiff testified that she had pain in her hand and forearm from the time of the accident until the time of trial. The pain was partially relieved by medication and then fully relieved by a stellate ganglion block. At the trial she testified that the pain was beginning to return because the effects of the block were wearing off. Several of plaintiff's treating physicians testified as to her complaints of pain and unsuccessful treatments.
Plaintiff visited Dr. Burvant regularly in 2001 in an unsuccessful attempt to treat her pain. When Dr. Burvant suggested invasive treatments, i.e. injections, she sought treatment from Dr. Kewalramani at Louisiana Physical Medicine and Rehabilitation Associates. Dr. Kewalramani's records indicate that plaintiff visited his office regularly from March 2002 until August 2002. When treatment with Dr. Kewalramani did not relieve her pain, she went back to Dr. Burvant who ordered nerve conduction studies. These studies revealed carpal tunnel syndrome, but were not diagnostic for RSD. Dr. Burvant then referred plaintiff to Dr. Bartholomew. By that time, plaintiff had tried numerous medications, physical therapy, and home exercises, and although at times her pain was decreased, it was only alleviated by the stellate ganglion block administered 2 1/2 years after the initial injury. Drs. Burvant and Bartholomew testified that they felt plaintiff's complaints were truthful. All of the physicians, who testified, including defendant's expert, stated that plaintiff had RSD. They further testified that while blocks will alleviate the pain for a while, the pain will return and at that point, surgery is indicated.
*505 Dr. Crapanzano explained the procedure for performing a stellate ganglion block, stating it was not a pleasant procedure and is one of the higher risk procedures performed in pain management. During this procedure, the patient is given a sedative and a local anesthetic while a needle is passed through their neck under the guidance of x-ray until the appropriate area is reached. Dr. Crapanzano explained that an intravenous line is started on the patient to treat any adverse reactions or complications that may occur. Although the procedure itself does not take very long, the patient must stay at the hospital for several hours for observation of any complications.
Given the duration and expected continued duration of plaintiff's pain we find the trial court erred in awarding only $5,000.00 in pain and suffering. Our review of the jurisprudence indicates that an award of $60,000.00 is the lowest possible award that could have been given for this type of injury. In Russell v. Evans, XXXX-XXXX (La.App. 4 Cir. 5/17/00), 763 So.2d 755, the trial court awarded the plaintiff, who suffered RSD, $60,000.00 in general damages. In that case, the plaintiff's treating physician testified that he diagnosed plaintiff with RSD after the physical exam showed no objective evidence of injury. The diagnosis was verified through the use of nerve blocks which relieved the symptoms. The plaintiff in that case eventually underwent a sympathectomy. In affirming the trial court's award, the Fourth Circuit stated that while there was testimony that the plaintiff was magnifying his symptoms, the trial court carefully considered the diagnosis of RSD and the evidence supported the conclusion that it was more probable than not that plaintiff had RSD.
The cases cited by the plaintiff affirmed much higher general damage awards and our review of these cases indicates they are not controlling. Plaintiff urges this court to award her $125,000.00 based on Dixon v. Winn-Dixie, 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306. In Dixon, the court affirmed an award of $125,000.00 in general damages to the plaintiff who suffered an aggravation of pre-existing RSD and neck and back injuries. However, we find that case not to be on point since the plaintiff in Dixon suffered pain from neck and back injuries in addition to RSD. Plaintiff also cites the case of Roig v. Travelers Insurance Company, 96-164 (La.App. 5th Cir.12/11/96), 694 So.2d 362, in which this court affirmed a general damage award of $300,000.00. Likewise, in Roig the plaintiff suffered injuries in addition to the RSD. In the other case cited by plaintiff, McCarroll v. Asplundh Tree Expert Co., 427 So.2d 881 (La.App. 1 Cir.1982), the plaintiff was not actually diagnosed with RSD. Rather, the Court noted the plaintiff suffered from sympathetic nerve dysfunction and stated his symptoms as involving his left shoulder, arm, and hand, as well as dilation of his left eye. Thus we find McCarroll not to be applicable.
Concerning the admissibility of surveillance tapes, the trial court is vested with discretion as to whether motion pictures or videotapes are admissible Olivier v. LeJeune, 95-0053 (La.2/28/96), 668 So.2d 347. The determination of the admissibility into evidence of videotapes must be done on a case-by-case basis depending on the specific facts and circumstances of each case. Kelly v. Riles, 99-601 (La.App. 5 Cir. 12/15/99), 751 So.2d 302. In making this determination the trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case, and whether it will aid the jury's understanding along with *506 whether the videotape will unfairly prejudice or mislead the jury, confuse the issues, or cause undue delay. Id. If the factors favoring admission are substantially outweighed by the factors against admission, the trial court may exclude the evidence. La. C.E. arts. 401-403.
The plaintiff contends the trial court erred in allowing the surveillance videotapes of her working into evidence. These tapes show the plaintiff at work in a coffee shop on three separate occasions. Plaintiff is shown serving coffee, serving food, picking up dishes and utensils, making coffee, and performing general duties associated with waitressing in a coffee shop. Plaintiff testified that she worked in the same coffee shop both before and after the accident. She never testified that she was unable to work; rather she testified that she could perform most of the duties associated with her job and could not perform "heavy work". Defendant argues that these tapes show the plaintiff having full use of her right hand and support the $5,000.00 general damage award. We do not disagree  the tapes show plaintiff using her right hand extensively. However, as Dr. Bartholomew pointed out, plaintiff was able to use her right hand because of the numerous medications she was taking. Our review of the record does not indicate that plaintiff testified that she was unable to use her right hand, only that her right hand and forearm were painful. Since the trial judge did not issue Reasons for Judgment, we do not know what part the videotapes played in the amount of general damages awarded, however, this is not relevant since we find the tapes were properly admitted.

CONCLUSION:
For the foregoing reasons, the judgment of the trial court with respect to future medical expenses of $20,000.00 is affirmed. The judgment is amended to increase the general damage award to $60,000.00. Each party is to bear its own costs of this appeal.
AFFIRMED AS AMENDED.