944 So.2d 648 (2006)
Sandra M. HARVIN, Wife of/and Joseph B. Harvin
v.
ANPAC LOUISIANA INSURANCE COMPANY.
No. 06-CA-204.
Court of Appeal of Louisiana, Fifth Circuit.
October 17, 2006.
*650 Lawrence D. Wiedemann, Attorney at Law, New Orleans, Louisiana, for Plaintiff/Appellee.
Steven B. Witman, Valerie Theng Matherne, Attorneys at Law, Metairie, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
This is a personal injury suit arising from a motor vehicle accident. Defendant, ANPAC Louisiana Insurance Company, appeals a judgment based on a jury verdict, as well as the denial of its motion for judgment not withstanding the verdict ("JNOV") and the grant of plaintiff's motion for JNOV. Plaintiff, Sandra M. Harvin, answered the appeal.
Sandra M. Harvin, wife of/and Joseph B. Harvin[1], filed suit for damages against defendant, their uninsured/underinsured motorist ("UM") carrier, alleging that on or about May 3, 2002 Sandra M. Harvin's ("Mrs. Harvin") vehicle was struck in the rear by another vehicle operated by Maggie L. Anderson ("Ms. Anderson"). Ms. Anderson's automobile insurer, Geico, subsequently paid the Harvins the policy's liability limit of $10,000.00. Defendant paid them $10,541.52 in payment of past medical expenses incurred by Mrs. Harvin and tendered $23,300.00 in settlement of all of their claims under their primary and umbrella insurance policies with defendant. The Harvins alleged in their petition that their damages far exceed the liability limits of Ms. Anderson's insurer and the tender made by defendant.
At the conclusion of evidence in the trial of this matter, plaintiff moved for a directed verdict on liability and the trial judge granted the motion. Therefore, the only questions before the jury pertained to the damages sustained by Mrs. Harvin. On March 24, 2005, the jury found that Mrs. Harvin had proven by a preponderance of the evidence that she sustained damages that were proximately caused by the May 3, 2002 accident and awarded the following damages:

 (a) General damages (pain
 and suffering and mental
 anguish, past, present
 and future, and past and
 future loss of ability to
 enjoy life and pursue
 happiness) $ -0-
 (b) Past Medical expenses $ 4,000.00 (epidurals)
 (c) Future medical expenses,
 if any $125,000.00
 (d) past and future loss of
 income $ -0-
 (e) past and future loss of
 physical function $ -0-
 TOTAL $129,000.00

*651 The jury further found that the defendant was not arbitrary, capricious, and without probable cause in failing to properly handle the Harvin's claim. The trial judge subsequently adopted the jury verdict in a May 19, 2005 judgment.
Plaintiff filed a motion for JNOV, or, in the alternative a motion for a new trial[2], seeking an award of general damages. Defendant also filed a motion for JNOV seeking to set aside the awards for past and future medical expenses. A hearing on both motions was held on August 3, 2005. In a judgment rendered on August 9, 2005, the trial judge, without written reasons, denied defendant's motion for JNOV and granted plaintiff's, finding that Mrs. Harvin is entitled to $150,000.00 in general damages. Defendant filed a suspensive appeal of the May 19, 2005 and August 9, 2005 judgments and plaintiff answered the appeal urging that the general damage award was inadequate.
The following evidence was presented at trial. Plaintiff, Sandra Harvin, testified that on the morning of May 3, 2002, five to ten seconds after entering Interstate 10 at the Bonnabel Boulevard ramp and merging into the right lane, she was rear ended. The "very strong impact" knocked her car forward approximately one car length and lifted her up out of her seat. She stated that she was thrust forward and then pulled back by her seatbelt, hitting her head on the steering wheel and then the back of her head against the seatbelt. Mrs. Harvin testified that she subsequently experienced headaches at work that day; and during the next few days she developed pain in the back of her neck and between her shoulder blades, as well as low back pain. Her back pain started at the right hip and radiated down her leg to her foot. She explained that the pain was "like shocks, pins and needles." Sometimes she had numbness in her leg and at other times sharp pains traveled down her leg.
Mrs. Harvin testified that prior to the accident at issue, she would occasionally experience brief back pain, but only after performing various chores in and around the house, such as mopping, gardening, and cleaning carpets. She admitted that she was diagnosed with scoliosis at age eleven by an orthopedic surgeon. However, she stated that she never had any problems with her back related to the scoliosis. She also admitted that she visited a chiropractor about twenty years ago, but could not recall the reason for the visit.
Mrs. Harvin testified that she would go on to see a series of doctors following the accident. Approximately three to four days after the accident Mrs. Harvin visited Stewart Altman, M.D. for treatment of her neck and back. She received physical therapy from Dr. Altman for a period of two to three months. In addition to Dr. Altman, she also began seeing a chiropractor, Dr. Robert Lizano. Under Dr. Altman's treatment, her neck pain eventually went away. Initially, Dr. Lizano's treatment for her back helped a great deal. However, over a period of time, her condition worsened, prompting Dr. Lizano to suggest that she see an orthopedist and have an MRI performed. Dr. Hamsa, an orthopedic surgeon, prescribed anti-inflammatories, pain medication, and muscle relaxants. Mrs. Harvin stated she did not take the pain medication every day because it made her head "feel funny" and interfered with work. The treatments recommended by Dr. Hamsa, i.e., facet blocks in her lumbar spine and a series of epidural *652 injections, provided only temporary relief. Eventually, with no improvement in her back or leg, Dr. Hamsa suggested that she see a neurosurgeon, Dr. Stefan Pribil. After reviewing her CAT Scan results, Dr. Pribil recommended a three-level fusion with BAK cages. Mrs. Harvin testified that she did not have the surgery because it is a "real severe" and "dangerous" surgery and it scares her.
On August 12, 2003, Mrs. Harvin visited John Cazale, M.D., an orthopedic surgeon, for an evaluation, at defendant's request. She testified that Dr. Cazale recommended a drug called Neurontin, which proved ineffective. Subsequent to the above recommendations and treatments, in September of 2004, she was involved in a motor vehicle accident in Gulfport, Mississippi while on her way to Copa Casino. According to Mrs. Harvin she was not injured.
Mrs. Harvin further stated that her condition has worsened, with periods during which the pain is so severe that she can barely walk. She testified that she now believes that she will have to have the three-level fusion with BAK cages surgery. The record includes estimates for the cost of the surgery, with the total ranging from $123,400.00 to $130,472.00.
In July of 2003 the Harvins decided to move from Metairie to Slidell. In January of 2004, Mrs. Harvin resigned, effective March 31, 2004, from the law firm she had been employed by for fifteen years as a legal secretary. The record includes Mrs. Harvin's letter of resignation in which she states, "since my accident of May 3, 2002, I have found it increasingly difficult to travel to, and from, the office by car and even more difficult to sit at my desk and type for 8 hours per day." However, shortly thereafter, in February of 2004, Mr. Harvin opened a law office in Slidell and Mrs. Harvin assisted in setting up the office and training her daughter to work for the firm. At the time of trial she was still going into the office at least once every week. She also babysits for her grandchild, born November 10, 2003, when her daughter is at the law office and at other times during the day.
Mrs. Harvin also testified regarding her personal activities since the May 3, 2002 accident. On June 1, 2002, she and her husband spent a week in California visiting their daughter Jennifer. While there they drove and walked around Beverly Hills and took a boat ride to Catalina Island. Mrs. Harvin stated that she had difficulty walking around Catalina and had to keep stopping. Eventually because of her problems, they decided to tour the area by car, rather than walking. In August of 2002 and 2004, plaintiffs traveled to South Carolina, where Mr. Harvin's mother lives. Mrs. Harvin also confirmed that she and her husband took a cruise to Mexico in April of 2003. Their excursions during the cruise included a bus ride "which didn't help me" and kayaking, during which she sat while her husband paddled. Mrs. Harvin also testified that she drives to casinos in the New Orleans area and occasionally Gulfport, Mississippi.
Joseph Harvin testified that prior to the May 3, 2002 accident, his wife had only routine aches and minor pains in her back. The evening of the accident he observed and she reported that she was having severe headaches; the following morning she felt stiff and "achy all over," but primarily her neck and shoulder were starting to cause her problems. By the time of her appointment with Dr. Altman, he observed that she was having back problems. She began having low back problems and pain radiating down her leg. He testified that the recommended treatments such as facet blocks and epidurals provided only temporary relief of her symptoms and her condition is getting worse. Mr. Harvin further *653 testified that his wife resigned her job as a legal secretary because the drive from Slidell to work in New Orleans was causing her too much pain. He stated that he and his wife have discussed her having back surgery and he does not think that she has any other choice but to have the surgery because of her ongoing problems.
Two former co-workers of Mrs. Harvin, Judy Ward and Kendrick Harding, also testified at trial. Ms. Ward testified that she has known Mrs. Harvin for twenty-eight years and worked with her as a legal secretary for twenty-five years. Prior to the May 3, 2002 accident, she never knew Mrs. Harvin to have any problems with her back. She described Mrs. Harvin before the accident as "always perky and bouncy and happy and singing." After the accident Mrs. Harvin "would always grab her back, she would  couldn't sit at her desk for any extended period of time because of  well, I guess it hurt her." Ms. Ward further stated, "it just changed her, I mean she was just not as happy because I guess when you're in pain, you just don't go around bouncy and bubbly, you know." Mr. Harding testified that he has known Mrs. Harvin for more than sixteen years. He stated that before the accident she was a "jolly go lucky person, she was full of energy." He also never knew her to have any back problems prior to the May 3, 2002 accident. After the accident "she was kind of moving slow, always trying to sit around, sometimes lays around crying out about her back problems."
Physicians Rudolf D. Hamsa, M.D., Stefan Pribil, M.D., and John Cazale, M.D., all testified at trial. Dr. Hamsa, an orthopedic surgeon, was accepted by the court as an expert in the field of orthopedic surgery. He testified that Mrs. Harvin was under his care for chronic pain management. Her first visit to his office was on September 6, 2002, after her thoracic and cervical problems had resolved. At that time she was suffering from a sciatic type pain into the thighs and calf. He reviewed Mrs. Harvin's MRI and it indicated a posteriorly ruptured disk at L5-S1 and disk dehydration and degenerative changes at L1-L2 and L2-L3. Additionally, he noted Grade 1 spondylolisthesis at L4-L5, an inherited condition. Dr. Hamsa recommended chiropractic treatment, a 3/8 inch heel lift to the right shoe to correct a congenital pelvic tilt, and medications (an anti-inflammatory and a muscle relaxant). At Mrs. Harvin's next visit Dr. Hamsa learned that the chiropractic treatment was not helping. He continued her medications and recommended selective facet injections. Following the facet injections Mrs. Harvin reported three days of relief, then a slow return of her symptoms. Dr. Hamsa next recommended that Mrs. Harvin see a neurosurgeon, Dr. Pribil, about possible future surgical intervention.
Dr. Hamsa further testified that at a subsequent visit, Mrs. Harvin reported the September 2004 accident and that she had not been injured. At her visit on April 20, 2004, Mrs. Harvin indicated that she had continued pain in the lower back and had to retire from work activity on March 31, 2004. Dr. Hamsa stated that he recommended surgical intervention because she continued to have pain in the back and radiation of pain in the legs after conservative measures had been exhausted. When asked at trial if he found any increase in her symptomology or further evidence of injury as a result of the September 2004 accident, Dr. Hamsa stated that he "couldn't relate anything one way or the other." Dr. Hamsa further testified that based on Mrs. Harvin's history, the May 3, 2002 accident is "apparently" the precipitating cause of her symptomology, her need for surgery, and the treatment he prescribed for her.
*654 Dr. Pribil, a board certified neurological surgeon, also testified at trial. The court accepted him as an expert in the field of neurological surgery. Dr. Pribil testified that he first saw Mrs. Harvin on March 25, 2003. Her general medical examination was, for the most part, unremarkable. Her strength was normal and he could not find any objective evidence of pain going down into the legs from the lumbar spine. He stated that her MRI study showed extensive disease in the lumbar spine with evidence of misalignment at the L4-L5 level and disk herniation at several other levels, as well as the presence of scoliosis. He was most concerned that her symptoms of back pain were referable to the L4-L5 level where she had a "fairly profound" area of narrowing, a "strangling of the nerves" due to the misalignment. He further explained that when you have misalignment of vertebrae to as great an extent as Mrs. Harvin, you have rupture of the ligaments that would normally hold the vertebrae in alignment. The misalignment is also an area of "potential weakness", "much more subject to damage if it is involved in some high force situation or whatever great force is exerted, either bending, lifting, stooping or accident or what not."
After this initial visit, Dr. Pribil recommended a CAT Scan to get a better picture of the "bony outline" and proposed minimally invasive percutaneous endoscopic disk surgery for temporary respite from the compressed nerve. However, after the CAT Scan revealed that there was a second bony abnormality at the L3-L4 level, the operation was abandoned. When asked at trial what type of surgery he finally recommended to Mrs. Harvin, Dr. Pribil responded that her MRI films were now nearly two years old so he would recommend that she have a stand-up MRI performed before he made his final recommendations. If the new MRI shows no change, then his recommendation would be a mid-line operation; typically the impairment rating from such a surgery would be from 25 to 30 per cent for the body as a whole. His surgical fee for such a procedure ranges from $25,000.00 to $30,000.00. However, if the symptoms do not warrant it, he "wouldn't touch that back." His preference is to avoid surgery whenever possible.
Dr. Pribil further testified that there is a reasonable probability that some of the spinal problems revealed by the MRI and CAT Scan were caused by the May 3, 2002 accident. Also, in his opinion, there is a reasonable medical probability that the symptoms reported by Mrs. Harvin after the accident and the necessity for surgery were caused by the May 3, 2002 accident. However, on cross-examination he admitted that the spondylolisthesis in Mrs. Harvin's lumbar spine more likely than not existed before the May 3, 2002 accident and the extensive degeneration in her spine which resulted in fissures, could also possibly be of a longstanding nature. He further testified that the longstanding combination of scoliosis and degenerative disk disease can cause increased stress on other levels of the spine above and below and contribute to pain and more degeneration over time. Additionally, he could not say that the accident caused any of the anatomical findings.
John Cazale, M.D., a board certified orthopedic surgeon testified at trial. He was accepted by the court as an expert in orthopedic surgery. Dr. Cazale first saw Mrs. Harvin on August 12, 2003, at the request of defendant, to evaluate and advise them of her condition. Mrs. Harvin complained of having back and right leg pain but was able to change positions easily. The neurological examination revealed that her reflexes and strength were okay. His only neurological finding was that she *655 complained of some decrease in sensation over the lateral aspect of her leg. Her straight leg raising test, which is performed to determine if something is pressing on the nerve, was negative. And she was able to stand on her heels and toes without any difficulty. She had a full range of motion of the lower back and he did not observe any particular muscle spasm at that time. He did observe an "obvious" curvature to her spine secondary to scoliosis when she bent forward. Dr. Cazale also reviewed both her MRI and her CAT Scan on that day. He noted a scoliotic curve and a slippage of one vertebra on the other, i.e., spondylolisthesis. Dr. Cazale stated that she has a Grade 1 spondylolisthesis (25% of the bone has slipped) at L4-L5 which is degenerative in nature. She was also noted to have some degenerative changes in the joints that connect the lower spine at L3-4, 4-5, and 5-1 and a bulging disk at L5-S1. He opined that these degenerative changes are longstanding; and it is more probable than not that the scoliosis and the degenerative findings of the spondylolisthesis pre-existed the May 3, 2002 accident. He further opined that pain going down into the leg from a pinched nerve, with the diagnostic findings that he established, can occur in the absence of a motor vehicle accident. He recommended continued conservative care, the anti-inflammatory Neurontin, an epidural steroid injection, and an EMG nerve conduction study if leg pain persisted.
Dr. Cazale next saw Mrs. Harvin on December 30, 2004. At this visit she did not inform him of the September 2004 accident. She reported flare ups of back pain and intermittent episodes of right leg pain; however, since she had stopped working, her pain was somewhat better. Her neurological examination was basically unchanged from the previous one. She had not had any further diagnostic studies or therapeutic injections. Accordingly, Dr. Cazale's recommendations were unchanged. He did not think she was a candidate for a three-level anterior lumbar fusion.
Defendant argues on appeal that the jury abused its discretion when it awarded plaintiff future medical expenses of $125,000.00. Defendant contends that any future medical treatment and expenses claimed by plaintiff and awarded by the jury are speculative, and are not supported by the expert medical testimony. Further, the trial court committed reversible error when it denied defendant's motion for JNOV which would have set aside the award for future medical expenses.
Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. Mendoza v. Mashburn, 99-499, 99-500 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, writ not considered, 00-0040, 00-0043 (La.2/18/00), 754 So.2d 957, writ denied, 00-0037 (La.2/18/00), 754 So.2d 976. The plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence. Id. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. LeMasters v. Boyd Gaming Corp., 04-1054 (La.App. 5 Cir. 2/15/05), 898 So.2d 497, writ denied, 05-0751 (La.5/6/05), 901 So.2d 1103. Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. Green v. K-Mart Corp., 03-2495 (La.5/25/04), 874 So.2d 838, 843. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Id.
*656 At trial Dr. Hamsa testified that he recommended surgical intervention for Mrs. Harvin and referred her to a neurosurgeon, Dr. Pribil, to discuss possible future surgical intervention because she continued to have pain after conservative measures had been exhausted. Mrs. Harvin testified that after reviewing her CAT Scan results, Dr. Pribil recommended a three-level fusion with BAK cages. She stated that she did not have the surgery at that time because it is a "real severe" and "dangerous" surgery that scares her. However, she also testified that her symptoms have worsened and she now believes that she will have to have the three-level fusion with BAK cages surgery. Although at trial Dr. Pribil refused to make a final recommendation for Mrs. Harvin without the benefit of a new MRI, he did testify that if there is no change from her earlier MRI and the symptoms warrant it, then he would recommend surgery. The evidence also sets out the probable cost of the surgery, with the total ranging from $123,400.00 to $130,472.00. While Dr. Cazale testified that he did not think Mrs. Harvin was a candidate for a three-level anterior lumbar fusion, a fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Therefore, we find that the jury did not err in awarding plaintiff $125,000.00 in future medical expenses and the trial judge did not err in denying defendant's motion for JNOV.
Defendant also argues on appeal that the trial court committed reversible error when it granted plaintiff's motion for JNOV and awarded plaintiff $150,000.00 general damages in addition to the amounts already received by plaintiff prior to trial. Plaintiff answered the appeal, asserting that the March 24, 2005 jury verdict, awarding her past and future medical expenses and no award for general damages was erroneous per se under Wainwright v. Fontenot, 00-0492, (La.10/17/00), 774 So.2d 70; and further, that the August 9, 2005 judgment granting her motion for JNOV and increasing the award to plaintiff by $150,000.00 in general damages is grossly inadequate and should be increased by $250,000.00 in general damages.
The standard of review for determining when a JNOV has been properly granted was reiterated in Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, as follows:
As enunciated in Scott [Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La. 1986)], a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Scott, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." Scott, 496 So.2d at 273; Jinks v. Wright, 520 So.2d 792, 794 (La.App. 3 Cir.1987).

*657 In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson, 583 So.2d at 832.

Joseph v. Broussard Rice Mill, Inc., 772 So.2d at 99.
The Supreme Court, in Wainwright, supra, stated that a verdict awarding medical expenses yet denying general damages is not per se invalid. A reviewing court faced with a verdict such as the one before us must ask whether the jury's determination that plaintiff is entitled to certain medical expenses, but not to general damages is so inconsistent as to constitute an abuse of discretion. Only after the reviewing court determines that the factfinder has abused its much discretion can that court conduct a de novo review of the record.
On our review, we find that the jury abused its discretion in failing to award general damages. Mrs. Harvin testified in detail and without contradiction about the effects of the accident on her, and that her condition has deteriorated so that she will consent to surgery that she considers dangerous in order to relieve her pain. She testified that her activities since the accident have been performed on a limited basis, and often in pain. Her husband and former co-workers corroborated her testimony that she did not experience severe problems until after the accident. Drs. Hamsa and Pribil testified as to the connection between Mrs. Harvin's current symptoms and the accident. It is clear from the evidence that the accident greatly exacerbated her pre-existing degenerative condition. One injured through the fault of another is entitled to full indemnification for damages caused thereby. "[A] defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." Wainwright v. Fontenot, supra, citing American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La. 1991).
Because the facts and inferences pointed strongly and overwhelmingly in favor of plaintiff, the jury abused its discretion in failing to award general damages. Consequently, we find that the trial court did not err in granting a JNOV.
Plaintiff complains that the general damages awarded by the JNOV were inadequate.[3] General damages are inherently speculative in nature and cannot be fixed with mathematical certainty, and include pain and suffering. Wainwright v. Fontenot, supra. The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." Id. Before a Court of Appeal can disturb an award made by a factfinder, the record must clearly reveal *658 that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Id.
In reviewing this case, we find that the trial judge did not abuse his vast discretion in determining the amount of general damages. The cases cited by plaintiff are inapposite to the circumstances in the present matter. Further, because we find no abuse of discretion, we need not compare the general damages determination in this case to that in past cases of similar injuries. Under the circumstances presented here, we hold that the award granted by the trial court sufficiently compensates Mrs. Harvin for her general damages.
For the foregoing reasons, the jury verdict granting future medical expenses is affirmed. The judgment granting the JNOV with regard to special damages is affirmed. Costs of this appeal are assessed to defendant.
AFFIRMED.
NOTES
[1] Plaintiff, Joseph B. Harvin, later moved to dismiss his claims and the trial judge, in a May 19, 2005 judgment, ruled that "all claims of plaintiff, Joseph B. Harvin, be and the same are hereby withdrawn and dismissed, with prejudice, each party to bear its own costs."
[2] Pursuant to this Court's August 23, 2006 order, the trial judge ruled on plaintiff's motion for a new trial, denying the motion on August 25, 2006.
[3] Lost wages are considered special damages, and in the present case, the jury interrogatories reflect that past and future losses of income were separate items from general damages. Plaintiff appealed only the general damages.