HUEY ANTILL, JR.

VERSUS

STATE FARM MUTUAL INSURANCE
COMPANY, JOHN HALDER, AND ALLSTATE
INSURANCE COMPANY

C/W

JAY PERRY ROHRBACKER AND SPOUSE,
SHAWN ROHRBACKER

VERSUS

JOHN HALDER & STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY

NO. 20-CA-131
C/W
20-CA-132

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 770-868 C/W 769-468, DIVISION "G"
HONORABLE E. ADRIAN ADAMS, JUDGE PRESIDING

December 02, 2020

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Stephen J. Windhorst

<u>**AFFIRMED**</u>
    **SMC**
    **FHW**
    **SJW**

COUNSEL FOR PLAINTIFF/APPELLANT,
HUEY ANTILL, JR.
    Craig S. Sossaman
    David E. Wawrose, Jr.

COUNSEL FOR DEFENDANT/APPELLEE,
STATE FARM MUTUAL INSURANCE COMPANY AND JOHN HALDER
    Helen M. Buckley
    Stephen C. Resor
    Amy Dunn Hotard
    Stephannie M. England

**CHEHARDY, C.J.**

This is a personal injury suit arising from an automobile accident. Plaintiff, Huey Antill, Jr., appeals a jury verdict in his favor, which assigned 15% fault to him and awarded damages for his injuries and past medical expenses, but denied his claim for future medical expenses. He seeks an increase in the damage awards, future medical expenses, and reversal of the jury's determination that he was comparatively at fault for the accident. Defendants, State Farm Mutual Automobile Insurance Company and John Halder (collectively, "defendants"), have answered the appeal, seeking a reduction of the award for special damages and reversal of the judgment ordering them to pay judicial interest and costs. For the following reasons, we affirm.

## Procedural History

Plaintiff, Huey Antill, filed suit for injuries he sustained in a rear-end collision with a Dodge Ram 1500 pickup truck driven by defendant, John Halder, and insured by State Farm.[1] After the matter was set for a jury trial, defendants made an offer of judgment to plaintiff in the amount of $80,000, inclusive of costs and fees, which plaintiff declined to accept. Thereafter, both sides filed motions in limine seeking to exclude evidence and limit testimony, which were heard and resolved on the morning of trial. The matter then proceeded to a three-day jury trial, at the conclusion of which the jury returned a verdict in favor of plaintiff in the amount of $58,842.58. Specifically, the jury awarded plaintiff $5,000 for past, present, and future physical pain and suffering, $46,842.58 for past, present, and future medical expenses, and $7,000 for past, present, and future mental anguish and emotional distress (including loss of enjoyment of life). The total amount

---

[1] Plaintiff also filed suit against Allstate Insurance Company, who was dismissed from the suit, without prejudice, prior to trial.

awarded to plaintiff was reduced by 15%, or to $50,016.19, due to the fault attributable to him for causing the accident.

Defendants moved for a judgment on its prior offer of judgment, which plaintiff opposed. On August 23, 2019, the trial court entered judgment in favor of plaintiff in accordance with the jury's verdict reflecting the final award of $50,016.19, in addition to awarding plaintiff legal interest and costs. A notice of judgment was mailed and issued that same date.

Post-trial motions filed by both parties followed. Plaintiff moved for a judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial conditioned on an additur. Defendants filed a motion for JNOV or remittitur. Plaintiff also moved for a judgment taxing costs against defendants. After hearing all of the post-trial motions, the trial court issued judgment denying both plaintiff and defendants' respective motions for JNOV and plaintiff's motion for new trial. Subsequently, the trial court issued judgment granting plaintiff's motion to tax costs and ordered defendants to pay $12,404.16 in costs to plaintiff. Additionally, the trial court denied defendants' motion for judgment on offer of judgment and motion to tax costs, and ordered Defendants to pay plaintiff judicial interest from the date of judicial demand in the amount of $5,982.07.

On appeal, plaintiff assigns the following errors: (1) the jury erred in assigning fault to plaintiff; (2) defendants failed to overcome the presumption that defendant was at fault in rear-ending plaintiff's vehicle; (3) defendants failed to establish that plaintiff created a sudden emergency; (4) the jury's general damages award was inadequate; and (5) the damages awarded for past, present, and future pain and suffering and mental anguish are disproportionate to plaintiff's 36 months of treatment and the $46,842.58 in medical expenses he incurred during that time, which the jury awarded in full.

In answer to the appeal, defendants assert the following errors: (1) the trial court's ruling on defendants' motion for judgment on offer of judgment and plaintiff's motion to tax costs should be reversed; (2) the trial court erred and abused its discretion in failing to award costs to defendants and failing to reduce costs awarded to plaintiff under La. C.C.P. arts. 970 and 1920; (3) the trial court erred and abused its discretion in failing to consider plaintiff's liability in assessing costs; (4) defendants should be awarded costs in the amount of $13,561.00 and plaintiff's award of costs should be reduced; and (5) the jury's award of past medical expenses should be reduced.

## FACTS

The accident occurred during the morning hours of April 14, 2016, on West Esplanade Avenue at its intersection with the northbound lanes of Power Boulevard in Metairie, Louisiana (hereinafter "the 2016 accident"). There is a median area located on West Esplanade between the north and southbound lanes of Power Boulevard, which is controlled by two traffic signals: one controlling traffic on West Esplanade at its intersection with the southbound lanes of Power Boulevard, and the other controlling traffic on West Esplanade at its intersection with the northbound lanes of Power Boulevard.

On the morning of the accident, plaintiff, a bartender and server in the restaurant industry, was driving his 2005 Toyota Tundra in an easterly direction on West Esplanade along with his guest passenger, Jay Rohrbacker. Knowing that the roadway was damp due to an earlier rain, plaintiff was proceeding on West Esplanade at the posted speed limit of 35 miles per hour. As they approached the intersection and *before* entering the median area, both plaintiff and Rohrbacker contend the traffic signal on West Esplanade where it intersects with the southbound lane of Power Boulevard turned from green to yellow. Plaintiff proceeded through the yellow light into the median area and slowed to a stop

before the second traffic signal, which controls the intersection of West Esplanade and the northbound lanes of Power Boulevard, that plaintiff and Rohrbacker contend had turned red. Moments thereafter, plaintiff's vehicle was struck from the rear by a Dodge Ram 1500 pickup truck, owned and operated by defendant, John Hadler, and insured by State Farm Mutual Insurance Company.

Also on the morning of the accident, defendant was coming from Kenner traveling east in the left lane of West Esplanade behind plaintiff's vehicle at, or slightly above, the posted speed limit.[2] Defendant recalled that the roadway was still damp from a prior light rain. *After* entering the intersection of West Esplanade and the southbound lanes of Power Boulevard, defendant claimed that he observed the traffic control signal turn from green to yellow. When he looked down from the traffic light, defendant saw that the distance between his truck and plaintiff's vehicle, which had suddenly come to a stop in the middle of the intersection within the median area, was closing in quickly and that he would not be able to stop in time to avoid a collision. When defendant put on his brakes, the front bumper of his truck slid into the rear bumper of plaintiff's vehicle.

Although plaintiff immediately felt a little confused and was shaking after the accident, he felt no immediate pain and declined emergency medical assistance at the scene. The onset of pain from his injuries did not begin until later that afternoon when he experienced a headache, neck pain, shoulder pain, and lower back pain. Plaintiff was treated for his injuries over the following three years through the date of trial. Prior to trial, a two-level fusion for a herniated disc at L5-S1 and a bulging disc at L4-5, which plaintiff claims was caused by the 2016 accident, was recommended by his treating neurosurgeon, but had not been performed as of the date of trial.

---

[2]     While defendant Hadler denied at trial that he was exceeding the speed limit, in an earlier deposition he testified that he was driving at, or slightly above, the posted speed limit.

The trial evidence was directed to whether plaintiff's back complaints and recommended surgery were casually related to the 2016 accident, whether his other physical complaints of injury were a result of the 2016 accident, and whether plaintiff was comparatively at fault for causing the accident. The testimony at trial focused on the intersection where the accident occurred; the color of the traffic signals as the parties entered the intersection; the degree of impact between the vehicles; whether plaintiff's complaints of back pain and the recommendation for future back surgery resulted from the trauma of the accident or was an aggravation of a pre-existing back condition caused by a prior 2011 accident and further exacerbated by a subsequent 2019 accident; and, whether plaintiff's recommended two-level fusion is medically warranted.

The accident was investigated by Jefferson Parish Sheriff's Deputy Kevin McGuffie, who characterized the damage to both vehicles as a result of the accident as "severe." At trial, he testified that while he had no independent recollection of the 2016 accident, he could attest to the contents of his report. Specifically, Deputy McGuffie stated that both drivers advised that they were traveling east on West Esplanade in the left lane when the traffic control signal at Power Boulevard turned from green to yellow. Both drivers also told him that when plaintiff slowed to a stop in the median area between the north and southbound lanes of Power Boulevard, defendant's vehicle struck the rear of plaintiff's vehicle. According to Deputy McGuffie, "there was no dispute that the light changed from green to yellow ... *at the point* the accident occurred." [Emphasis supplied.] Deputy McGuffie did not recall, nor did his report reflect, that anyone at the scene advised him that the taillights of plaintiff's vehicle were not functioning properly as he would have documented this in his report under "any defects" of that vehicle. Additionally, Deputy McGuffie explained to the jury that the solid white line found on West Esplanade immediately prior to its

intersection with the southbound lanes of Power Boulevard "normally dictated for the stop lines as to where traffic should stop at if a crosswalk is located." Deputy McGuffie noted that while no stop line was located on West Esplanade in the median area where it intersects with the northbound lanes of Power Boulevard, "some people do and some people don't" stop in the median between the two traffic signals that control the intersection.

At trial, plaintiff denied that his taillights were malfunctioning on the day of the accident. Plaintiff testified that as he approached the intersection, he moved through the first traffic signal, which he claimed had already turned from green to yellow prior to his entering the median area, and slowed to a stop because the second traffic control signal had turned red. He stated that as soon as he brought his vehicle to a stop, he immediately felt two impacts from defendant's vehicle, which he claimed "threw [his truck] almost three or four lanes of travel" into Power Boulevard. Plaintiff testified that the force of the impact caused significant frame damage underneath his truck, broke the seat brackets, and pushed the trailer hitch downward. Additionally, in the bed of his truck was a tire and rim, which propelled out of the truck and landed on the ground after impact. According to plaintiff, State Farm paid $12,337.00 for the total loss of his truck.

The trial testimony of Jay Rohrbacker, plaintiff's guest passenger, corroborated plaintiff's version of the accident. In particular, Rohrbacker testified that when they approached Power Boulevard, the first light had already turned yellow when they entered the intersection so they came to a "slow stop" in the median area because the second light had turned red. Rohrbacker stated that he had no knowledge as to whether or not the taillights on plaintiff's vehicle were functioning properly immediately prior to the accident. Rohrbacker claimed that he suffered a concussion and back injuries from the impact of the collision and was transported from the scene via ambulance.

Defendant, who claimed to have frequently traveled West Esplanade and was familiar with the intersection, testified that the two traffic signals controlling both intersections of West Esplanade with the north and southbound lanes of Power Boulevard are "synced" and turn from green to yellow and yellow to red simultaneously. Additionally, defendant stated that while he had previously observed vehicles stop at the intersection in the median area between the two traffic signals, he could not recall ever having seen more than one vehicle at a time stopped there, nor had he ever personally stopped in the middle of that intersection as the median area does not contain a stop line.

With respect to the subject accident, defendant testified that he had already entered the median area between the north and southbound lanes of the familiar intersection after the first traffic control signal had already changed from green to yellow. He claimed that he never saw the second traffic light turn red prior to plaintiff stopping or prior to the impact. According to defendant, plaintiff stopped in the middle of an intersection during a yellow light that never turned red prior to the collision.

Defendant testified that even though plaintiff's vehicle was initially traveling several car lengths in front him, because the brake lights on plaintiff's truck were malfunctioning and the traffic control signal had not yet turned red, he had no indication that plaintiff was going to stop until it was too late to avoid a collision. Defendant further testified that he told an officer on the scene about plaintiff's faulty taillights. Defendant also stated that while the force of the impact between the vehicles caused his airbags to deploy, the impact caused plaintiff's truck to move forward only "a little bit" into Power Boulevard. According to defendant, an unsecured tire that was sitting atop debris in the bed of plaintiff's truck "flipped out" and landed on his windshield smashing it. Defendant claimed that while he was a little "foggy" immediately after the accident, he did not sustain any injuries

other than a brush burn to his face, which he thought came from the air bag that deployed. He described the damage to plaintiff's truck as "moderate," and stated that his own "brand new" truck sustained $16,000.00 in damages that took months to repair.

Plaintiff testified at trial that immediately after the accident, although he experienced a bit of confusion, apparently from hitting the left side of his head against the window, he was full of adrenaline and not aware of any specific pain. He denies, however, that he told the investigating officer that he was not injured. Instead, plaintiff explained that he declined medical assistance at the scene because he had no medical insurance and could not afford a medical bill, and that he did not want to leave his truck stranded on the highway. Plaintiff claimed that he moved his truck a couple of blocks ahead of the scene and parked it on the side of the road. He called his uncle to come tow his vehicle, contacted his parents to come get him, and then contacted his lawyer, who had previously assisted plaintiff in obtaining medical help without incurring any out-of-pocket expenses following a 2011 automobile accident. Plaintiff explained to the jury that, in the hours following the collision, he began to notice a headache, confusion, and pain in his neck, shoulder and low back. With the assistance and recommendation of his attorney, plaintiff was able to schedule a medical evaluation for that afternoon with Louisiana Primary Care Consultants ("LPCC").

At trial, plaintiff introduced the testimony of two of his medical doctors with whom he sought treatment for his injuries following the accident, including Dr. Fernando Martinez, a board-certified internal medicine physician at LPCC. Dr. Martinez testified that when he first examined plaintiff on the afternoon of April 14, 2016, the date of the accident, plaintiff's chief complaints were a headache on the left side of his head, neck pain, pain in his shoulders, as well as pain in his lower back. After obtaining a medical history, Dr. Martinez performed a physical

exam. While plaintiff reported tenderness, he had no cervical, thoracic or lumbar spasms, no radiating symptoms in his extremities, and was neurologically intact. X-rays obtained of plaintiff's cervical and lumbar spine were negative for any fractures or dislocations. Based on the medical history provided by plaintiff, his physical exam, and after reviewing the x-rays, Dr. Martinez's initial diagnosis was that plaintiff had sustained a closed head injury with no loss of consciousness, post-traumatic headache, cervical strain, and lumbar strain as a result of the subject accident.[3] Dr. Martinez recommended treatment in the form of medication and "physical medical treatments in the office," and restricted plaintiff from raising, lifting, or moving anything weighing more than twenty pounds.

Approximately two weeks after the accident, plaintiff sought emergency medical treatment at East Jefferson Hospital complaining of headaches, confusion, back pain, neck pain, and rib pain. While there, he underwent a CT scan of his brain, which was negative, an EKG of his heart, which was normal, and a chest x-ray, which was also normal.

Dr. Martinez testified that his clinic continued to treat plaintiff for his injuries for several months with various physical therapy modalities and medication. In June 2016, due to persistent complaints of pain, Dr. Martinez's office ordered magnetic resonance imaging (MRI) scans for plaintiff's cervical spine, lumbar spine, and shoulders. The lumbar MRI revealed abnormal findings, including a bulging disc at L4-5, a herniated disc at L5-S1, a ruptured annulus at L5-S1, and thickening and roughening of many of the joints in plaintiff's lower back. The MRIs of plaintiff's shoulders also revealed abnormal findings, including tendinitis and nerve impingement in both shoulders. Based on these abnormal

---

[3] According to Dr. Martinez, after the accident plaintiff reported trouble sleeping, concentrating, and remembering immediate words and events, all of which Dr. Martinez related to the blunt head trauma plaintiff received in the 2016 accident.

findings, Dr. Martinez testified that it was recommended that plaintiff consult with a neurologist.

In August 2016, while still under the care of LPCC physicians, plaintiff consulted with Dr. Morteza Shamsnia, a neurologist at Advance Neurodiagnostic Center, who recommended EMG and nerve conduction studies of plaintiff's lower extremities.[4] Dr. Shamsnia later performed these studies in October 2016, which revealed left L5-S1 radiculopathy, or damage to the nerves, as well as bilateral posterior tibial and left peroneal neuropathy. Dr. Shamsnia's impression was that plaintiff was suffering with post-traumatic headaches, concussion, memory loss, headaches, anxiety, insomnia, and pain in his low back, shoulder and neck.

Dr. Martinez testified at trial that plaintiff remained under both his care, as well as the care of others from LPCC, from April 14, 2016 through February 7, 2017,[5] however, the prescribed medication and conservative treatment did not obviate plaintiff's low back and intermittent neck pain.[6] LPCC discharged plaintiff on February 7, 2017, with the recommendation that he follow up with neurosurgery or orthopedics. Based on the information made available to him, and given that plaintiff was purportedly free from pain prior to the subject 2016 accident, Dr. Martinez opined that it was more probable than not that plaintiff's head trauma, neck pain, back pain, and shoulder trauma were caused by the 2016 accident. Dr. Martinez further opined that the MRI and EMG findings support his conclusion.

On cross-examination, Dr. Martinez testified that when he took plaintiff's medical history on the date of the accident, plaintiff denied any previous injuries or that he was experiencing any pain prior to the 2016 accident. Dr. Martinez stated

---

[4]    Neither Dr. Shamsnia, nor any of the other physicians that treated plaintiff at LPCC other than Dr. Martinez, testified at trial.

[5]    The last date Dr. Martinez personally examined plaintiff was on August 29, 2016, three years prior to trial. Dr. Martinez was not aware that plaintiff was in a subsequent 2019 accident.

[6]    The medical records indicate that plaintiff's shoulder and chest pain had apparently resolved by December 2016.

that, while plaintiff did report a 2004 automobile accident wherein he suffered no injuries, plaintiff did not reveal that he had previously undergone treatment for a back injury that he sustained in a prior 2011 automobile accident. Plaintiff also did not disclose to anyone at LPCC that he had undergone a 2008 work-related injury to his back or a 2007 work-related injury to his shoulder. Nevertheless, because plaintiff reported that he was not experiencing any pain immediately prior to the subject 2016 accident, Dr. Martinez testified that information about these prior accidents and injuries did not change his medical opinion that the head, neck, back, and shoulder injuries for which he and others at LPCC treated plaintiff in 2016 were caused by the subject accident.

Medical records admitted into evidence at trial from Spectrum Neurology show that Dr. Troy Beaucoudray, a neurology specialist who did not testify at trial, treated plaintiff for pain management approximately every two months from January 2017 until September 2017. According to his records, Dr. Beaucoudray's impression was that plaintiff was suffering with post-concussive syndrome, post-traumatic headaches, "intravertebral disc displacement," radiculopathy, cervicalgia, shoulder pain, and myalgia. Because of plaintiff's ongoing complaints that were unresolved by one lumbar epidural steroid injection and prescription medication, Dr. Beaucoudray recommended a neurosurgery consultation.

Dr. Donald Dietze, a board certified neurosurgeon, testified at trial on behalf of plaintiff. He testified that he began treating plaintiff in July 2017 for neck pain, back pain, and headaches attributable to the 2016 automobile accident made the basis of this suit. During the course of treatment, plaintiff's predominant complaint was of pain in his lower back and lower extremities. Dr. Dietze stated that he reviewed plaintiff's previous medical records from LPCC (including the findings of the MRI of his lumbar spine showing broad-based bulging of the L4-5 disc and herniation of the L5-S1 disc), the results of the EMG/nerve conduction

studies performed by Dr. Shamsnia (demonstrating bilateral L4 and right S1 radiculopathies), and from Dr. Beaucoudray.  Based on his review of these records, the medical history provided to him by plaintiff, and his physical examination of plaintiff, Dr. Dietze recommended that plaintiff undergo a SPECT-CT[7] scan, discography, and discogram of his lumbar spine.  These tests were performed on plaintiff in the fall of 2017, and, according to Dr. Dietze, demonstrated abnormalities at the L4-5 and L5-S1 levels consistent with discogenic or neurological pain.  Specifically, the discogram revealed a right full-thickness annular tear at L4-5, which defect Dr. Dietze opined was most likely the generator for plaintiff's back and leg pain.  In February 2018, Dr. Dietze ordered a left L5-S1 transforaminal epidural steroid injection for purposes of determining a surgical plan for plaintiff, which was performed during the summer of 2018.  Based upon the positive findings from the various diagnostic testing, Dr. Dietze recommended a two-level lumbar fusion surgery for plaintiff, which was originally scheduled for September 2018.  Due to plaintiff's work schedule, the surgery was postponed until 2019 after Mardi Gras.  Unfortunately, when plaintiff again returned to see Dr. Dietze in March 2019, he had been involved in a third automobile accident nine days prior wherein he further injured his lumbar spine.  Because of the 2019 accident, Dr. Dietze testified that surgery for plaintiff was put on hold indefinitely.

Dr. Dietze testified that he had also reviewed medical records pertaining to plaintiff from Clearview Internal Medicine wherein he was treated by Dr. Ivo Baronne, a family medicine specialist, from January 2011 to July 2011 for injuries plaintiff suffered following a motor vehicle accident (the "2011 accident"). According to Dr. Dietze, the 2011 records he reviewed showed that plaintiff's complaints consisted of headaches, neck pain, back pain, and shoulder pain, which

---

[7]     A SPECT-CT scan, or a single-photon emission computerized tomography ("SPECT"), is a nuclear imaging test that uses a radioactive substance and a specialized camera to create 3-D photographs.

Dr. Dietze admitted at trial were "[h]onestly very similar" to plaintiff's complaints following the 2016 accident. Dr. Dietze compared the lumbar MRI imaging obtained in 2011 to the imaging obtained in 2016, and while he conceded that findings on the two MRIs were essentially the same, the difference was in the measurements. He opined that following the 2011 accident, the annular tear was only noted to be a "partial tear," whereas a "full thickness tear" was seen on discography after the 2016 accident. In Dr. Dietze's opinion, the "full thickness tear" of the annulus was a "new finding" resulting in a significant change in plaintiff's lumbar spine and was most likely caused by the acute trauma plaintiff experienced in the subject 2016 accident.

On cross-examination, when confronted with the results of the 2016 MRI of plaintiff's lumbar spine that did not note the full thickness annular tear at L4-5, which Dr. Dietze claimed was a "new" injury caused by the 2016 accident, Dr. Dietze admitted that annular tears are not always seen on MRI. Dr. Dietze also conceded that because plaintiff did not undergo a discogram after the 2011 accident, he had nothing with which to compare the discogram performed following the 2016 accident that revealed the full thickness tear of the annulus.

Defendants presented testimony of Dr. Everett Robert, a board-certified neurosurgeon, who performed an independent medical examination of plaintiff in September 2017 at defendants' request. Dr. Robert testified that he was specifically asked to evaluate plaintiff in light of Dr. Dietze's recommendation for lumbar fusion surgery. Dr. Robert stated that when he obtained plaintiff's medical history, plaintiff denied ever having any type of neck, back, arm, or leg issue. On examination, all objective tests (*i.e.*, testing for weakness, reflexes, etc.) were normal. Plaintiff's strengths were normal and he had no deficits in sensation. However, when Dr. Robert elicited some of the reflexes, he testified that plaintiff's complaints of pain in response did not make neurological sense. Further, when Dr.

Robert pressed on plaintiff's lower back and neck, plaintiff complained of pain in his leg, which Dr. Robert explained to the jury was medically nonsensical.

Dr. Robert testified that when he reviewed the 2016 MRI reports, his impression was that plaintiff suffered from degenerative disc disease, a wear and tear, overgrowth of the joint, and not from a "singular traumatic event." Specifically, Dr. Robert could see "[n]o evidence of any trauma per se" on the 2016 MRI. There was no mention of hemorrhage or edema on the MRI that was performed only ten weeks after the accident. Dr. Robert also reviewed a CT scan of plaintiff's head taken two weeks after the accident, which he testified was "normal" and did not show any type of intracranial injury. According to the medical records he reviewed, plaintiff had no loss of consciousness, no loss of speech, no obvious hesitation in cognition, and followed commands well on the day of the accident. In Dr. Robert's opinion, despite the impressions of the LPCC physicians, Dr. Shamsnia and Dr. Beaucoudray that plaintiff suffered with post-concussive syndrome for eight to ten months, he saw no evidence from a neurological vantage of post-concussive syndrome or any neurocognitive abnormalities.

In Dr. Robert's opinion, after reviewing the medical records made available to him from LPCC, Dr. Shamsnia, Dr. Beaucoudray and Dr. Dietze, the 2016 MRI report showing mild degenerative changes, and based on the findings from his physical examination of plaintiff wherein he was neurologically intact and exhibited no objective abnormalities, plaintiff was not a surgical candidate for a two-level lumbar fusion. Moreover, Dr. Robert opined that plaintiff's low back pain, more probably than not, was not associated or caused by the 2016 accident.

Following his independent medical examination of plaintiff, Dr. Robert was advised of plaintiff's prior 2011 back injury and an MRI of his lumbar spine that was taken at that time. Dr. Robert was able to obtain, review, and compare the

actual films of the 2011 and 2016 MRIs. When asked about the measurement differences between the MRI imaging in 2011 and 2016, Dr. Robert's opinion conflicted with that of Dr. Dietze's in that he found these slight differences were not clinically significant. Dr. Robert explained to the jury that the 2011 and 2016 studies were likely done "on two different machines" where "the magnet is better on one MRI than the other." Consequently, it is typical to "see some mild variations when we look at an MRI separate in time and two different machines." Dr. Robert observed no difference in the 2011 and 2016 imaging from a "clinical or a practical perspective," which indicated to him that plaintiff's "anatomy hadn't changed from the pre-accident MRI."

Moreover, Dr. Robert stated that he observed no evidence of trauma on the 2016 MRI, whereas the 2011 MRI showed hemorrhage and edema, which is evidence of trauma. Dr. Robert testified that in his opinion, plaintiff had suffered "[n]o anatomical injury as a result of the [2016] accident." Further, Dr. Robert testified that he agreed with the radiologist's findings on the 2011 MRI showing that plaintiff had a L5-S1 disc herniation, which was the same as that seen on the 2016 MRI. To correlate with the observed herniation, plaintiff reported left-leg pain and lower back pain at the time the 2011 MRI was performed, as well as continued low back pain and leg pain at the time the second MRI in 2016 was performed.

On cross-examination, Dr. Robert conceded that plaintiff had an annular tear at his L4-5 disc and an L5-S1 disc herniation, which are objective signs of injury, however, he testified that these injuries pre-dated the 2016 accident. Dr. Robert disagreed with Dr. Dietze's impression that the annular tear at L4-5 was worsened by the 2016 accident because there was "[n]o clinically significant change between the [2011] and [2016] MRIs." Additionally, Dr. Robert admitted that in his report he recommended that plaintiff undergo a discogram and that if the results

therefrom demonstrated a pain generator, he would join in Dr. Dietze's recommendation of lumbar fusion surgery. Dr. Robert also conceded that Dr. Dietze reported that the discogram revealed a full annular tear at L4-5 that was likely a pain generator. However, after reviewing the actual report, "which show[ed] a grade 4 annular tear …," the same grade 4 annular tear as seen on the MRI, Dr. Robert discounted the findings on the basis that the discogram was improperly administered. Dr. Robert explained to the jury that it is generally accepted that in order for the discogram to be a valid test, a negative control (*i.e.*, a needle placed in the spine at a different level other than the level documented as positive for generating pain) has to be established in order to validate the positive portion of the exam. Because the physician that performed the discogram, Dr. John Logan, did not document any control in his report, Dr. Robert presumed that a control was not done. Dr. Robert concluded that plaintiff's annular tear and disc bulge at L4-5 preceded the 2016 accident and was most likely the pain generator for the lower back pain plaintiff experienced in 2011 and in 2016. In his medical opinion, it was more probable than not that plaintiff sustained no new anatomical injuries in the 2016 accident, and to the extent he sustained any injuries at all, they were soft tissue injuries, and plaintiff should have returned to baseline (*i.e.*, a herniation at L5-S1 and a bulge and annular tear at L4-5) within eight to ten weeks following the accident.

## STANDARD OF REVIEW

In reviewing a trial court's findings of fact, appellate courts employ a "manifest error" or "clearly wrong" standard of review. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are more reasonable. *Id.* Where there are two permissible views of the

evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* While an appellate court must review the trial court's conclusions in light of the entire record, it "must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996, 1007 (citing *Rosell*, 549 So.2d at 844).

## DISCUSSION

### *Allocation of Fault*

In plaintiff's first, second, and third assignments of error, taken together, he contends the jury manifestly erred in its allocation of fault. Specifically, plaintiff alleges the jury erred in assigning fifteen percent of the fault for causing the accident to him, that defendants failed to overcome the legal presumption that defendant was one hundred percent at fault for rear-ending plaintiff's vehicle, and that defendants failed to establish that plaintiff's actions created a sudden emergency.

Causation is a fact-specific inquiry. *Ruttley v. Lee*, 99-1130 (La. App. 5 Cir. 5/17/00), 761 So.2d 777, 785, *writ denied*, 00-1781 (La. 9/22/00), 768 So.2d 1287. Like all factual findings, the trier of fact is owed great deference in its allocation of fault and its findings may not be reversed unless clearly wrong or manifestly erroneous. *Clement v. Frey*, 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607, 609-610; *Tamayo v. American Nat. General Ins. Co.*, 14-130 (La. App. 5 Cir. 9/24/14), 150 So.3d 459, 465. Under this standard, the inquiry is not whether this court, had it been sitting as the trier of fact, would have made a different finding, but instead, whether the jury's finding was reasonably supported by the evidence. *Raspanti v. Liberty Mut. Ins. Co.*, 05-623 (La. App. 5 Cir. 1/31/06), 922 So.2d 631, 634, *writ denied*, 06-476 (La. 5/5/06), 927 So.2d 314. Allocation of fault is a factual determination and the trier of fact, unlike the appellate court, has the benefit of

viewing firsthand the witnesses and evidence. *Tamayo*, 150 So.3d at 465. It is the appellate court's duty to give deference to the trier of fact. *Id*. An appellate court may reallocate fault only after it has found an abuse of discretion and then only to the extent of lowering or raising the percentage of fault to the highest or lowest point reasonably with the trial court's discretion. *Hill v. Morehouse Parish Police Jury*, 95-1100 (La. 1/16/96), 666 So.2d 612, 614.

The proper allocation of fault requires an analysis of both parties' conduct. *Watson v. State Farm*, 469 So.2d 967, 974 (La. 1985). An appellate court's determination of whether the trier of fact was clearly wrong in its allocation of fault is guided by the factors set forth in *Watson*, such as the awareness or inadvertence of the acts, the severity of the risks, the significance of what was sought by the conduct, the capacity of the actors, whether superior or inferior, and any other factors which might cause a person to act in haste. *Id*. at 974; *Davis v. Vosbein*¸12-626 (La. App. 5 Cir. 5/16/13), 119 So.3d 100, 102.

All motorists owe a general duty to observe what should be observed. *Mart v. Hill*, 505 So.2d 1120, 1123 (La. 1987). Additional duties arise depending upon the motorist's movements on the roadway in relation to other vehicles. Relevant to the instant case are the duties and presumptions associated with a motorist entering an intersection, and with a following motorist.

First, La. R.S. 32:1(33)(a)[8] defines "intersection" as "[t]he area embraced within the prolongation or connection of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways of two highways which join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict." Additionally,

---

[8] La. R.S.32:1(33)(a), formerly 32:1(26)(a), was re-designated by Acts 2020, No. 152, § 1, effective August 1, 2020.

La. R.S. 32:1(33)(d)(i)[9] provides that "[w]here a highway includes a stop line, yield line, or crosswalk that has not been designated on the roadway within the median between the separate intersections, the two intersections and the roadway median between them shall be considered as one intersection." If, however, the highway contains a "stop line, yield line, or crosswalk [that] is designated on the roadway on the intersection approach, the area within the crosswalk or beyond the designated stop line or yield line shall be a part of the intersection." La. R.S. 32:1(33)(d)(ii).[10]

Second, with regard to the following motorist, the law has established a rebuttable presumption that a following motorist who strikes a preceding motorist from the rear has breached the standard of conduct prescribed by La. R.S. 32:81(A) and is therefore liable for the accident. *Harbin v. Ward*, 13-1620 (La. App. 1 Cir. 5/19/14), 147 So.3d 213, 218. The rule is based on the premise that a following motorist either has failed in his responsibility to maintain a sharp lookout or has followed at a distance from the preceding vehicle which is insufficient to allow him to stop safely under normal circumstances. *Id*. While a following motorist may assume that the vehicle in front is being driven with care and caution, he must drive at an appropriate speed and must maintain an interval between the two vehicles under circumstances which should be reasonably anticipated. *Leonard v. Favaloro*, 05-206 (La. App. 5 Cir. 10/6/05), 916 So.2d 1191, 1192 and *Harbin*, 147 So.3d at 218.

A following motorist, however, may rebut the presumption of negligence by proving that he had his vehicle under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances. *Phipps v. Allstate*

---

[9] La. R.S.32:1(33)(d)(i), formerly 32:1(26)(d)(i), was re-designated by Acts 2020, No. 152, § 1, effective August 1, 2020.
[10] La. R.S.32:1(33)(d)(ii), formerly 32:1(26)(d)(ii), was re-designated by Acts 2020, No. 152, § 1, effective August 1, 2020.

*Ins. Co*., 05-651 (La. App. 5 Cir. 2/27/06), 924 So.2d 1081, 1084. The following motorist may also avoid liability by proving that the driver of the lead vehicle negligently created a hazard that he could not reasonably avoid (a sudden emergency). *Tamayo*, 150 So.3d at 466. However, the rule of sudden emergency cannot be invoked by one who has not used due care to avoid the emergency. *Anderson v. May*, 01-1031 (La. App. 5 Cir. 2/13/02), 812 So.2d 81, 86. The following motorist must exonerate himself from fault before he can completely avoid liability. *Id*. at 85. Although the sudden emergency doctrine was developed when contributory negligence was a complete bar to recovery, our courts continue to apply the doctrine. *Duzon v. Stallworth*, 01-1187 (La. App. 1 Cir. 12/11/02), 866 So.2d 837, 858, *writs denied*, 03-589, 03-605 (La. 5/2/03), 842 So.2d 1101, 1110. While the sudden emergency doctrine has not been subsumed by comparative fault, some courts have treated the defense of sudden emergency as one of the factual considerations used in assessing the degree of fault to be attributed to a party. *Harbin*, 147 So.3d at 218. *See also*, *Manuel v. St. John the Baptist Parish Sch. Bd.*, 98-1265 (La. App. 5 Cir. 3/30/99), 734 So.2d 766, 769, *writ denied*, 99-1193 (La. 6/4/99), 744 So.2d 632.

In the instant case, plaintiff contends the jury erred in failing to apply the appropriate standard and burden of proof in evaluating defendant's fault in causing the accident. Plaintiff argues that in assessing him with fifteen percent of the fault, the jury failed to properly consider the presumption that a following motorist is liable when he strikes the vehicle in front of him. In particular, plaintiff avers defendants did not establish that defendant had control over his vehicle, that he closely observed plaintiff's vehicle, or that he was following plaintiff's vehicle from a safe distance and at a safe speed. Plaintiff further argues that defendants failed to establish that plaintiff's actions created a hazard which could not be avoided. Plaintiff concludes that if defendant was traveling attentively at a safe

distance behind his vehicle and at a safe speed, he could have stopped in time to avoid the accident.

At trial, plaintiff testified that as he approached the intersection, he was driving the posted speed limit and, despite the damp roadways from an earlier rain, he was able to slow down and come to a complete stop within the median area at the traffic signal for the northbound traffic on Power Boulevard, which he claims had turned red. Plaintiff's testimony was corroborated by his guest passenger, Jay Rohrbacker.

Defendant testified that he was driving at, or slightly above, the speed limit at the time of the accident. He contended that while he could not state the exact distance at which he was traveling behind plaintiff, he recalls being several car lengths behind him when he applied the brakes. He claimed that when he approached the intersection, the traffic signal controlling West Esplanade and the northbound lanes of Power Boulevard was still green and did not turn yellow until he actually entered the intersection and the median area. Defendant testified that when he looked down from the traffic signal, he realized that the distance between his truck and plaintiff's truck was "closing in quickly." Defendant claimed that because he did not see operational brake lights on plaintiff's truck, in addition to the fact that the traffic signal controlling the southbound lanes of Power Boulevard was still yellow and had not yet turned red, he had no indication that plaintiff was going to stop before it was too late to avoid a collision. Defendant testified that when he braked, his tires screeched, and his truck skidded on the wet pavement and slid into the rear of plaintiff's truck.

Deputy McGuffie testified that, according to his report, plaintiff, Rohrbacker and defendant all agreed that the traffic signal was yellow at the time the collision occurred. He further testified that no stop line, which normally dictates where a vehicle is to stop as one approaches an intersection, was located on the roadway

within the median area before the traffic signal controlling West Esplanade and the northbound traffic on Power Boulevard.

Ultimately, the jury apportioned eighty-five percent of the fault to defendants and fifteen percent to plaintiff. The record supports the jury's conclusion. The jury's allocation of comparative fault is reasonably premised upon its factual findings concerning the nature of each party's wrongful conduct and the extent of the causal relationship between the conduct and the accident. In light of the conflicting trial testimony regarding whether plaintiff's brake lights were properly functioning, whether the traffic signal was yellow or red when the impact occurred, and, in the absence of a stop line on the roadway in the median area at the subject intersection, whether or not plaintiff fell below the standard of care of a motorist by stopping in the middle of an intersection, we find that it was not unreasonable for the jury to determine that plaintiff was partially, albeit minimally, at fault for this accident. Mindful that the trial court is entitled to great deference in its allocation of fault, and that we may not substitute our own judgment for that of the trial court when the trial court's ruling is based on a reasonable interpretation of the evidence, in light of the totality of the evidence, we cannot say the jury's allocation of fault is manifestly erroneous. Thus, we will not reassess fault. Plaintiff's first, second, and third assignments of error do not merit relief.

*Quantum*

In plaintiff's fourth and fifth assignments of error, he contends that the jury abused its discretion in granting an inadequate award for general damages, and for failing to award any amount for future medical expenses. Conversely, in answer to plaintiff's appeal, defendants argue the jury's award for past medical expenses should be reduced to reflect its award for general damages. We find the jury did not abuse its vast discretion in awarding general or special damages to plaintiff

**General Damages**

Our jurisprudence has consistently held that in the calculation of general damages, considerable discretion is left to the jury. *Coco v. Winston Indus. Inc.*, 341 So.2d 332, 335 (La. 1976). The discretion vested in the jury is great, even "vast," so that an appellate court should rarely disturb an award of general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Upon appellate review, general damage awards will be disturbed only where there has been a clear abuse of that discretion. *Coco*, 341 So.2d 332.

> The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70, 74; *Youn*, 623 So.2d at 1261. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. *Youn*, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of damages in a particular case. *Id.* at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. *Id.* If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. Prior awards under similar circumstances serve only as a general guide. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. *Id.*; *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La. 1993).

*Thibodeaux v. Gulfgate Construction, LLC*, 18-676 (La. App. 3 Cir. 3/7/19), 270 So.3d 721, 729. Damages awarded by a jury are to be reviewed in the light most favorable to the prevailing party. *Harrington v. Wilson*, 08-544 (La. App. 5 Cir.

1/13/09), 8 So.3d 30, 40. It is only if the award is so disproportionate to the injury that it "shocks the conscience," that a trial court is deemed to have abused its discretion. *Id*.

In addition, the defendant must compensate a plaintiff for the full extent of the injuries plaintiff sustained, even if defendants simply aggravated a pre-existing condition. *Lasha v. Olin Corp.*, 625 So.2d 1002, 1006 (La. 1993). However, before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim's current condition must be established. *Purvis v. Jefferson Parish Hospital Service*, 16-434 (La. App. 5 Cir. 12/21/16), 209 So.3d 363, 373.

In the instant case, the jury awarded plaintiff 12,000 in general damages: $5,000 for past, present, and future pain and suffering; and $7,000 for the loss of enjoyment of life. Plaintiff contends that having found that he suffered injuries in the 2016 automobile accident, and in light of the jury's having awarded him $46,842.58—which happens to total the exact amount of the medical expenses plaintiff incurred from the date of the accident through March 20, 2019, the date of his third accident—the jury's award of $12,000 in general damages is inadequate. We do not find that the trial court abused its vast discretion with respect to the general damage award, nor do we find that the award shocks the conscience.

It is evident from the evidence and trial testimony in the record that the jury simply did not believe plaintiff's claim that he suffered significant injuries in the 2016 accident. Based on our review, we are unable to find the jury was clearly wrong in their obvious conclusions that plaintiff's annular tear, L4-L5 bulging disc, and L5-S1 herniated disc pre-dated the subject accident, and that the recommendation for future lumbar surgery was not attributable to the 2016 accident. The testimony reveals that plaintiff was not forthcoming in providing a *complete* medical history on his initial visit to any of the physicians who treated

him following the subject accident, including the IME doctor. Specifically, he failed to mention the back injuries he sustained in a 2011 automobile accident and a prior work-related accident, and failed to advise that he had previously injured his shoulder in a separate work-related accident. Moreover, the jury apparently chose to believe Dr. Robert's testimony over that of Dr. Dietze that plaintiff had not suffered any "new" injury after the 2016 accident and, to the extent that plaintiff did sustain injury, those injuries were soft-tissue in nature and should have resolved within eight to ten weeks. Further, on cross-examination, Dr. Dietze conceded that plaintiff's reported symptoms following both the 2011 and 2016 accidents were "honestly very similar" and that the findings on 2011 and 2016 MRIs were "essentially the same."

Moreover, plaintiff was the only witness to testify at trial regarding his personal activities since the 2016 accident. He testified that while he did not stop working following the accident, he had a hard time maintaining full-time employment in the restaurant industry due to his lower back pain. Plaintiff did not make a lost wage claim. Plaintiff also testified that since the 2016 accident, he was no longer able to play basketball, work out, or play with his young daughter like he previously was able to. The jury's findings as to the extent and duration of plaintiff's injuries were factual determinations, relying largely on the credibility of the witnesses. It is axiomatic that an appellate court may not disturb a jury's findings unless they are clearly wrong or manifestly erroneous. *Ferrell v. Fireman's Fund Insurance Co.*, 94-1252 (La. 2/20/95), 650 So.2d 742, 745.

We also find no merit to plaintiff's argument that the general damages award is inadequate in light of the jury's award for the full amount of his past medical expenses. To the contrary, by awarding plaintiff *any* amount in general damages, the jury apparently concluded that he had suffered an aggravation of his pre-existing lumbar condition as well as other injuries as a result of the 2016 accident.

Thus, it is not unreasonable to also conclude that the jury found that the various medical tests and treatment that plaintiff underwent at the recommendation of his treating physicians to treat the aggravation of his pre-existing lumbar condition and other ailments were necessitated by the subject accident. In our view, the jury did not abuse its vast discretion by awarding plaintiff $12,000.00 in general damages. We will not disturb the jury's award.

**Special Damages**

Special damages, such as past and future medical expenses, are those which have a "ready market value," such that the amount of damages can be calculated with relative certainty. *Kaiser v. Hardin*, 06-2092 (La. 4/11/07), 953 So.2d 802, 810. In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. *Id.* (citing *Guillory v. Ins. Co. of North* America, 96-1084 (La. 4/8/97), 692 So.2d 1029); *Guillory v. Lee*, 09-75 (La. 6/26/09), 16 So.3d 1104, 1118. An appellate court may not set aside this finding unless, in view of the entire record, it is manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844. Moreover, when a trier of fact assesses special damages, the discretion is more limited or narrower than the discretion to assess general damages. *Dufrene v. Gautreau Family, LLC*, 07-467, 07-547 (La. App. 5 Cir. 2/22/08), 980 So.2d 68, 83, *writs denied*, 08-629 (La. 5/9/08), 980 So.2d 694 and 08-628 (La. 5/9/08), 980 So.2d 698. The standard of review, however, is still that of abuse of discretion. *Id.* at 83.

Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. *Mendoza v. Mashburn*, 99-499, 99-500 (La. App. 5 Cir. 11/10/99), 747 So.2d 1159, 1170, *writ*

*not considered*, 00-40, 00-43 (La. 2/18/00), 754 So.2d 957, *writ denied*, 00-37 (La. 2/18/00), 754 So.2d 976 (citing *Mayeaux v. Denny's Inc.*, 95-453 (La. App. 5 Cir. 10/18/95), 633 So.2d 822, 826).  The plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence.  *Id.* Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable costs.  *Duncan v. Kansas City Southern Railway Co.*, 00-66 (La. 10/30/00), 773 So.2d 670, 685; *LeMasters v. Boyd Gaming Corp.*, 04-1054 (La. App. 5 Cir. 2/15/05), 898 So.2d 497, 503, *writ denied*, 05-751 (La. 5/6/05), 901 So.2d 1103.  Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony.  *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So.2d 838, 843.  A fact finder may accept or reject the opinion expressed by the expert, in whole or in part.  *Id.*

Plaintiff claims that, in light of his treating physician's testimony that he needs future back surgery as a result of the 2016 accident, the jury abused its discretion in failing to award any amount for future medical expenses.  Conversely, defendants contend the jury properly determined that plaintiff was not entitled to future medical expenses based on its "obvious" finding—as evidenced by its general damages award—that plaintiff did not sustain significant injuries as a result of the 2016 accident.  Defendants argue that a review of plaintiff's medical history and the medical testimony offered at trial prove that his injuries pre-existed the 2016 accident and, further, that any need for future back surgery was not caused by the subject accident.

We are unable to find that the jury was clearly wrong in its obvious conclusion that any future medical expenses plaintiff may incur are not attributable to the 2016 accident.  In this regard, the record contains two competing experts regarding plaintiff's need to undergo surgery, and if warranted, whether the need for surgery resulted from the subject 2016 accident.  Plaintiff's treating

neurosurgeon, Dr. Dietze, testified that in his opinion, more probably than not, the 2016 accident worsened plaintiff's lumbar condition such that he now requires surgery. On cross-examination, however, Dr. Dietze admitted that, after reviewing the MRI conducted on plaintiff's lumbar spine following his 2011 accident, the bulging L4-5 disc and herniated L5-S1 disc more likely than not existed before the 2016 accident and that those findings in 2011 would have warranted surgery. Dr. Dietze's testimony was discounted by defense's expert neurosurgeon, Dr. Robert, who testified that in his medical opinion, based on his finding that plaintiff had not suffered any new anatomical injuries in the 2016 accident, any future medical treatment was unrelated to the 2016 accident.

Additionally, subsequent to Dr. Dietze's recommendation for surgery, which plaintiff decided to postpone, plaintiff was involved in a third automobile accident in 2019. Interestingly, the jury heard testimony that following the 2019 accident, instead of returning to LPCC for treatment, plaintiff sought treatment from yet another facility, Health Care Center, and continued treatment there at least up to one month prior to the August 2019 trial. Also, Dr. Dietze, who did examine plaintiff following the 2019 accident and opined that plaintiff sustained further injury to his lumbar spine, testified that he would not perform any surgery on plaintiff until after the extent of his injuries from the subsequent 2019 accident can be determined, which might require a different, or more extensive, surgery than the one he was recommending for plaintiff prior to the 2019 accident.

We find that the jury simply found Dr. Robert's testimony was more compelling, and that his medical findings were amply supported by the record and plaintiff's testimony. It was reasonable for the jury to conclude that the evidence tended to disprove that plaintiff suffered the lumbar disc injuries in the 2016 accident. Likewise, there exists in the record a reasonable factual basis for the jury's finding that the future surgery Dr. Dietze recommends, which plaintiff may

or may not undergo, was not as a result of the instant accident, but rather, was necessitated by the prior 2011 accident. We find the jury's findings are based on reasonable credibility determinations and factual evaluations which will not be disturbed unless manifestly erroneous. We do not find the jury abused its vast discretion in concluding that an award for future medical expenses is not warranted.

Likewise, we find no reason to upset the jury's award for past medical expenses, which in its answer to appeal, defendants seek a reduction. According to defendants, given the minimal amount awarded to plaintiff in general damages, it is clear the jury did not believe that plaintiff sustained significant injuries as a result of the 2016 accident. Thus, by awarding plaintiff $46,842.58—the exact amount he was claiming in past medical expenses—defendants contend the jury's sympathies obviously came into play in making that award, which constituted an abuse of its vast discretion. For all of the reasons heretofore stated, we find no abuse of the trial court's vast discretion in awarding plaintiff the full amount of the past medical expenses he incurred.

### *Litigation and Expense Costs*

In their answer to plaintiff's appeal, defendants seek reversal of the trial court's ruling, which denied their motion for judgment on offer of judgment and granted plaintiff's motion to tax costs and ordering defendants to pay plaintiff $12,404.16 in costs and $5,982.07 in judicial interest.

Under the particular facts and circumstances of this case, defendants argue that the general procedure for taxing costs found in La. C.C.P. art. 1920—that costs shall be paid by the party cast (in this case, defendants)—does not apply because on July 1, 2019, in accordance with La. C.C.P. art. 970, defendants timely made a written offer of judgment to plaintiff in the amount of $80,000.00, *inclusive* of attorney fees and costs, which plaintiff rejected. Specifically, according to

defendants, the total amount of damages the jury awarded to plaintiff ($58,842.58), coupled with the costs plaintiff incurred after the offer of judgment was made and interest accrued from the date of judicial demand through the offer of judgment ($9,408.56), equals $68,251.14. When this amount is reduced by plaintiff's fifteen percent assessment of fault, the total amounts to $58,013.47. Because this amount is less than $60,000.00, or less than twenty-five percent of the amount of the offer of judgment, defendants argue the trial court erred under La. C.C.P. art. 970(C), in failing to rule that plaintiff is obligated to pay the costs defendants incurred after the offer of judgment was made, which defendants contend totals $13,561.00. We disagree.

Louisiana Code of Civil Procedure Article 970 provides for the payment of costs when an offer of judgment has been made and rejected. The purpose of Article 970 is to compensate the rejected offeror who was forced to incur greater trial litigation costs than he would have if the offeree had accepted his settlement offer. *Carcamo v. Raw Bar, Inc.*, 12-294 (La. App. 5 Cir. 11/27/12), 105 So.3d 936, 938. Article 970 is punitive in nature and, therefore, must be strictly construed. *Id.* Article 970 provides, in pertinent part:

> A. At any time more than twenty days before the time specified for the trial of the matter, without any admission of liability, any party may serve upon an adverse party an offer of judgment for the purpose of settling all of the claims between them. The offer of judgment shall be in writing and state that it is made under this Article; *specify the total amount of money of the settlement offer; and specify whether that amount is inclusive or exclusive of costs, interest, attorney fees*, and any other amount which may be awarded pursuant to statute or rule. …
>
> &ast;&ast;&ast;
>
> C. If the final judgment obtained by the plaintiff-offeree is at least twenty-five percent less than the amount of the judgment by the defendant-offeror … *the offeree must pay the offeror's costs*, exclusive of attorney fees, *incurred after the offer was made*, as fixed by the court.

***

E. For purposes of comparing the amount of money offered in the offer of judgment to the final judgment obtained which judgment shall take into account any additur or remittitur, the final judgment obtained shall not include any amounts attributable to costs, interest, or attorney fees, or to any other amount which may be awarded pursuant to a statute or rule, *unless such amount was expressly included in the offer*. [Emphasis supplied.]

It is undisputed by defendants that the written offer of judgment it issued to plaintiff was for the total amount of $80,000.00, "**inclusive of interests, attorney's fees, and costs**." Defendants seek to have this Court interpret La. C.C.P. art. 970 to mean that plaintiff, the offeree, is entitled to include in his calculation of costs and interest, **only** those costs that he incurred **after** the offer of judgment was made, and judicial interest from the date of judicial demand **only** up to the date of the offer of judgment, or through July 1, 2019. We find, however, that defendants' interpretation conflicts with the express language of the codal article.

Specifically, when calculating the total amount of the judgment awarded to the offeree for purposes of determining whether the total award exceeds twenty-five percent of the amount contained in the offeror's offer of judgment, La. C.C.P. art. 970(E) allows the offeree (*i.e.*, plaintiff) to take into account "**any** amounts attributable to costs, interest, or attorney fees" when the offer of judgment is **inclusive** of these amounts, such as defendants' offer of judgment made in the instant case. In other words, the Article does not limit the plaintiff to including in his calculation only those litigation costs that he incurred *after* the offer of judgment was made, nor does it limit his calculation of interest from the date of judicial demand *only* up to the date of the offer of judgment as proposed by defendants. Rather, when the offer of judgment is **inclusive** of costs, interest, or attorney fees, as in the instant case, the plaintiff is allowed to include any and all

litigation costs he incurred, as well as the total amount of judicial interest calculated from the date of judicial demand until paid. Under the express language of La. C.C.P. art. 970(C), it is only when the plaintiff becomes obliged to pay the *defendant's* costs that the calculation of *costs* is limited solely to those costs incurred *by the defendant* after the offer of judgment was made.[11] La. C.C.P. art. 970(C).

In the instant case, defendant does not dispute that plaintiff incurred a total of $12,404.16 in litigation costs, or that judicial interest accrued from the date of judicial demand until paid was $5,982.07, for a total of $18,386.23 in interest and costs. Even if this amount were discounted by plaintiff's fifteen percent fault, the total amount of interest and costs discounted equals $15,628.30. When this amount is added to the jury's award of $50,016.19, the final judgment on behalf of plaintiff totals $65,644.49. Accordingly, we find the trial properly applied La. C.C.P. 970 when it ordered defendants to pay all of plaintiff's litigation costs and judicial interest calculated from the date of judicial demand until paid.

Further, the trial court has the discretion to assess costs of a suit in any equitable manner. *Willis v. Ochsner Clinic Foundation*, 13-627 (La. App. 5 Cir. 4/23/14), 140 So.3d 338, 361. The trial court is afforded great discretion in awarding costs and an award of costs can only be reversed on appeal upon a showing of abuse of discretion. *Id.* The defendants have failed to show that the trial court abused its discretion in its assessment of costs. Although plaintiff was found to be fifteen percent at fault, we disagree with defendant that the trial court was mandated under La. C.C.P. art. 1920 to reduce the costs awarded to plaintiff by plaintiff's percentage of fault. Defendants' assignment of error is without merit.

---

[11] Pursuant to La. R.S. 13:4203, "[l]egal interest shall attach from date of judicial demand, on all judgments, sounding in damages, 'ex delicto', which may be rendered by the courts." Thus, legal interest attaches from the date of judicial demand *until paid*.

## CONCLUSION

Accordingly, for the foregoing reasons, we affirm the trial court's judgment in all respects.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 2, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 20-CA-131
### C/W 20-CA-132

**E-NOTIFIED**

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE E. ADRIAN ADAMS (DISTRICT JUDGE)
CRAIG S. SOSSAMAN (APPELLANT)          HELEN M. BUCKLEY (APPELLEE)          STEPHANNIE M. ENGLAND (APPELLEE)
STEPHEN C. RESOR (APPELLEE)

**MAILED**

DAVID E. WAWROSE, JR. (APPELLANT)          AMY DUNN HOTARD (APPELLEE)
ATTORNEY AT LAW                            MARCELLE P. MOULEDOUX (APPELLEE)
3351 SEVERN AVENUE                         ATTORNEYS AT LAW
SUITE 201                                  365 CANAL STREET
METAIRIE, LA 70002                         SUITE 1710
                                           NEW ORLEANS, LA 70130